**In re SAHLEN & ASSOCIATES, INC. SECURITIES LITIGATION.**

**No. 89–6308–CIV–WMH.**

United States District Court, S.D. Florida.

July 10, 1991.

Laz L. Schneider, Sherr Tiballi Fayne & Schneider, Fort Lauderdale, Fla., for plaintiffs Feld, Ehrenkrantz.

Atlee W. Wampler, III, Wampler, Buchanan & Breen, Miami, Fla., for plaintiffs.

Jan Douglas Atlas, Atlas Pearlman & Trop, Fort Lauderdale, Fla., for defendant Logal.

Lewis N. Brown, Gilbride Heller & Brown, Miami, Fla., Alan Geolot, Sidley & Austin, Washington, D.C., for KPMG Peat Marwick.

Jane W. Moscowitz, Jay Starkman, Steel Hector & Davis, Miami, Fla., for defendant Bodden.

Marvin Pickholz, Paul Murphy, David Pollack, Mindy Pallot, Stroock & Stroock & Lavan, Miami, Fla., for defendant Sahlen, Jr.

James H. Schropp, Henry A. Hubschman, Jonathan M. Jacobs, Fried Frank Harris Shriver & Jacobson, Washington, D.C., for defendants Burgoyne, Pledger, Gellman, Schaefer & Wallace.

## MEMORANDUM & ORDER

HOEVELER, District Judge.

THIS CAUSE comes before the Court on numerous motions to dismiss filed by various Defendants in six of the consolidated actions bearing the master file number 89–6308–CIV–HOEVELER.[1]

### FACTUAL BACKGROUND

Prior to 1986, Sahlen & Associates, Inc. ("SAI" or "the Company"), a Delaware corporation with its principal place of business in Deerfield Beach, Florida, was a relatively small company primarily involved in providing private investigative services to the insurance industry, attorneys and other corporate clients. In 1986, however, SAI undertook an aggressive expansion campaign geared toward offering a broader range of security-related services in a wider range of locations. In order to carry out its plan for massive growth, SAI acquired several security-related businesses, obtaining funding essentially from the investing public through both private and public security offerings. SAI ultimately became one of the largest uniformed security guard and private investigative service companies in the world.

It was not long, however, before the sweet SAI success turned sour. On April 12, 1989, the Company Board of Directors announced that the Security Exchange Commission ("SEC") had begun an informal investigation into certain revenue recognition and accounting practices of the Company. In conjunction with this investigation, the Board launched a probe of its own and decided to withdraw its proposed public offering of securities and postpone the registration of common shares held by shareholders pending completion of the investigations. It took the Company's investigating committee merely a day to discover that SAI's financial statements contained extensive overstatements of the accounts receivable and revenues, ultimately requiring SAI to "writedown" approximate-

1. *Feld, et al. v. Sahlen ("Feld"),* Case No. 89–6308; *Investment Limited Partnership v. Sahlen ("ILP"),* Case No. 89–6601; *Adler, et al. v. Sahlen ("Adler"),* Case No. 89–7061; *The Revere Fund,* *Inc. v. Sahlen ("Revere"),* Case No. 90–2019; *Franklin Corp. v. Sahlen ("Franklin"),* Case No. 90–2895; *B.F. Enterprises v. Sahlen ("B.F. Enterprises"),* Case No. 90–6115.

ly $45 million in its accounts receivable.[2] Shortly thereafter, the Board dismissed its top executive officer, Harold F. Sahlen, and three Executive Vice Presidents—Lawrence E.C. Bodden, Aarif Dahod and Nelson H. Logal—for their alleged misconduct in connection with a scheme to manipulate profits and overstate assets. Moreover, as a result of SAI's disclosures, KPMG Peat Marwick Main & Company ("PMM")[3], the public accounting firm which served as an independent auditor for SAI, withdrew its previous audit opinions and interim review letters for fiscal years 1986, 1987 and 1988, and informed stockholders and the investing public that they should not rely on these statements. As would be expected, the price of SAI common stock, in reaction to these disclosures, plunged dramatically. The stock is now virtually worthless. On May 30, 1989, SAI filed a petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.

Following the Board's announcements beginning April 12, 1989, numerous corporate and individual investors who had purchased SAI securities filed suit against the Company[4], various officers and directors referred to as the "Individual Defendants"[5], PMM and McKinley, Allsopp & Company ("McKinley Allsopp"), a broker-dealer that participated in a 1987 private placement of SAI securities. On June 11, 1990, in response to the myriad actions which had been and were anticipated to be filed, the undersigned entered an Order ("Pretrial Order No. 1") consolidating the various class-action and individual cases for pretrial purposes. While differing in some respects, the complaints before the Court, bearing Master File No. 89–6308, allege that the defendants conspired in a grand scheme (known as "the Project") to falsely portray the true financial condition of SAI, thereby inducing the plaintiffs to invest in the Company. Plaintiffs assert that SAI employees, in furtherance of this deceptive scheme, inflated billings by writing up false invoices for work not actually done, forged clients' names, tampered with confirmation letters sent out by the accountants, and implemented a computer software program reflecting the spurious information. In addition, Plaintiffs complain that the defendants circulated false and misleading statements concerning SAI's overinflated accounts receivable and revenues in the reports and financial statements of the Company and in press releases in order to produce the illusion that the Company was rapidly growing and highly successful and to entice the investing public into providing the Company with capital for its rapid expansion. Moreover, Plaintiffs contend, Defendants were motivated to conceal the true financial condition of SAI in order to protect their management positions with the Company, hide their own misconduct and mismanagement, and enhance the value of their own stock.

---

**2.** This writedown left the company with a balance of only $25 million in accounts receivable.

**3.** Peat Marwick Main & Company merged with KMG Main Hurdman ("KMGMH") in April of 1987. KMGMH audited and reported on the annual financial statements of SAI beginning with its 1985 fiscal year. For purposes of discussion, both companies shall be collectively referred to as PMM. Additionally, effective January 1, 1990, Peat Marwick Main & Co. changed its name to KPMG Peat Marwick.

**4.** As an automatic stay is imposed by 11 U.S.C. § 362(a) when a petition for reorganization is filed pursuant to Chapter 11, Plaintiffs in those actions naming SAI as a defendant are not prosecuting their claims against SAI at this time.

**5.** Named as "Individual Defendants" in each of the six actions before the Court are the following: Harold F. Sahlen, Jr., Chairman of the Board, Chief Executive Officer, and President since SAI's inception; Lawrence E.C. Bodden, Executive Vice–President of Administration; Aarif Dahod, Executive Vice–President of Corporate Development; and Nelson H. Logal, Executive Vice–President of Finance and Chief Financial Officer responsible for the preparation of the Company's financial statements. This group of defendants shall be referred to as the "Management Defendants" for purposes of discussion. Other "Individual Defendants" named in some, but not all, of the Complaints are the following: J. Albert Burgoyne, Thomas R. Pledger, Warren B. Gelman, Ronald D. Schaefer, Robert Wallace, Edward W. Rose III (all directors of SAI) and Richard A. Brooke, an Executive Vice–President of the Company and Chief Financial Officer since August 1988. This group, with the exception of Mr. Brooke, shall be referred to as the "Outside Directors."

These complaints before the Court assert a panoply of claims under both state and federal law, including (1) violations of § 10(b) and § 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1990), (2) violations of § 12(2) and § 15 of the Securities Act of 1933, 15 U.S.C. §§ 77*l*(2) and 77*o*, (3) aiding and abetting federal securities violations, (4) violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962(a), (b), (c), and (d), (5) common law fraud and deceit, (6) negligent and reckless misrepresentation, (7) ordinary and gross negligence, (8) violations of § 517.211 and § 517.301 of the Florida Securities and Investor Protection Act ("FSIPA"), Fla.Stat. §§ 517.211 and 517.301, and (9) common law conspiracy. Defendants move to dismiss the various counts of the complaints pursuant to Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure and for lack of pendent jurisdiction.

It is well-established that a "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–56, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957). Moreover, a court must assume all allegations of a complaint are true for purposes of a motion to dismiss. *St. Joseph's Hosp., Inc. v. Hospital Corp. of America*, 795 F.2d 948, 953 (11th Cir.1986); *Stone Mountain Game Ranch, Inc. v. Hunt*, 746 F.2d 761, 763 n. 4 (11th Cir.1984). It is with this standard in mind that the Court proceeds.

## DISCUSSION

### I. § 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934

In each of the cases at issue, Plaintiffs have brought a claim against all Defendants for violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[6] and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1990),[7] alleging that the defendants intentionally made misrepresentations or omissions of material fact on which Plaintiffs detrimentally relied. In order to state a cause of action under § 10(b) and Rule 10b–5, a plaintiff must allege: (1) a misstatement or omission (2) of a material fact (3) made with scienter, (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury. *Ross v. Bank South, N.A.*, 885 F.2d 723, 728 (11th Cir.1989) (en banc), *cert. denied*, —— U.S. ——, 110 S.Ct. 1924, 109 L.Ed.2d 287 (1990); *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1046 (11th Cir.1987). Defendants move to dismiss those counts of the complaints asserting federal securities fraud, arguing, among other contentions, that Plaintiffs have failed to adequately set forth reliance, scienter and loss causation.[8] Each of these arguments will be considered in light of Rule 9(b)'s requirement of pleading fraud with particularity.

---

**6.** 15 U.S.C. § 78j(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**7.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by use of any means or instru-mentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

**8.** Defendants have not moved to dismiss the Rule 10b–5 claim in *ILP*.

■ Rule 9(b) provides that when fraud is pled in federal court, "the circumstances constituting fraud ... shall be stated with particularity," but that allegations concerning a defendant's state of mind "may be averred generally." Fed.R.Civ.P. 9(b). Pleading fraud with greater specificity than is normally required by the federal rules is necessary in order to (1) provide defendants with sufficient notice of the acts of which the plaintiff complains to enable them to frame a response, (2) prevent fishing expeditions to uncover unknown wrongs and (3) protect defendants from unfounded accusations of immoral and otherwise wrongful conduct. *Knight v. E.F. Hutton and Co., Inc.,* 750 F.Supp. 1109, 1114 (M.D.Fla.1990). This rule does not abrogate notice pleading under Rule 8 of the Federal Rules of Civil Procedure, however. "[A] court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of rule 9(b) with the broader policy of notice pleading." *Friedlander v. Nims,* 755 F.2d 810, 813 n. 3 (11th Cir.1985). *See also Durham v. Business Management Associates,* 847 F.2d 1505, 1511 (11th Cir.1988). Therefore, while mere conclusory allegations of fraud will not satisfy Rule 9(b), allegations which provide a reasonable delineation of the underlying acts and transactions allegedly constituting the fraud are sufficient. *First Union Brokerage v. Milos,* 717 F.Supp. 1519, 1522 (S.D.Fla.1989). *See also Durham,* 847 F.2d at 1512 ("Allegations of date, time or place satisfy the Rule 9(b) requirement that the *circumstances* of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule."). Additionally, the degree of specificity required by Rule 9(b) may vary according to the background of the parties and the information available to them at the time of pleading. *Summer v. Land & Leisure, Inc.,* 571 F.Supp. 380, 384 (S.D.Fla.1983). In securities fraud cases, for instance, courts have determined that strict application of Rule 9(b) could result in substantial unfairness to private litigants who could not possibly have detailed knowledge of all the circumstances surrounding the alleged fraud. *Id.; In re U.S. Oil & Gas Litig.,* 1988 WL 28544 at * 1, 1988 U.S.Dist. LEXIS 2217 at 3 (S.D.Fla. Feb. 8, 1988).

## A. *Reliance*

### 1. Actual Reliance

■ Reliance is an essential element of a Rule 10b–5 action as it "establishes the causal link between the defendant's activities and the plaintiff's injuries and prevents federal securities law from affording unlimited liability." *Ross,* 885 F.2d at 728. In order to recover in this Circuit, a plaintiff generally must show that he "reasonably" relied upon a misrepresentation or omission made by the defendant. Reasonable reliance is determined by asking, first, whether the individual actually relied and then by ascertaining whether he was duly diligent in having done so. *Huddleston v. Herman & MacLean,* 640 F.2d 534, 548 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Gochnauer,* 810 F.2d at 1047. Thus, a plaintiff's reliance must be actual as well as "justifiable," meaning that "with the exercise of reasonable diligence one still could not have discovered the truth behind the fraudulent omission or misrepresentation." *Id.*

■ Principally relying on the particularity requirement of Rule 9(b), Defendants contend that the allegations of the various complaints are insufficient as they do not specify which plaintiffs received which documents, whether any particular plaintiff read any particular document, nor whether Plaintiffs' reliance was "reasonable" if in fact they did read the documents. Accordingly, the defendants argue, Plaintiffs have not properly alleged an essential element of their cases. Each of the complaints at issue details at great length the allegedly deceptive scheme by which Defendants defrauded them. They set forth the allegedly misleading prospectuses, annual and interim reports, certification letters of PMM, press releases, SEC filings and other public documents issued by SAI, describing the dates of issuance, the misleading nature of the documents and the persons responsible

for their dissemination. Plaintiffs then contend that in reliance on the veracity of these statements and reports, they purchased SAI's securities at artificially inflated prices. Despite these lengthy allegations, however, Defendants in *Feld* and *Adler* are correct in noting that Plaintiffs have not stated which particular documents were read or reasonably relied upon by which Plaintiffs. Consequently, Plaintiffs have failed to sufficiently plead actual reliance.

 Plaintiffs in the remaining three cases, however, have adequately set forth direct reliance. In *B.F. Enterprises,* Plaintiffs state whether they purchased SAI securities at the 1987 Private Placement or participated in the 1987 Bridge Financing or the 1988 Exchange Offering. They then claim that they relied on the specific document circulated by Defendants to encourage investors to engage in the particular transaction involved. Therefore, the defendants have sufficient notice as to which plaintiff allegedly relied upon which particular document. In addition, Plaintiffs state that further action on their part would not have alerted them to the Project, thus satisfying the "due diligence" requirement. Similarly, the allegations in *Franklin* and *Revere* are sufficient. Both are actions brought by one individual investor, who claims that it relied on the contents of the various documents named throughout the complaint. As in *B.F. Enterprises,* Defendants are aware of which misstatements Plaintiffs allegedly relied upon. Moreover, although neither the Revere Fund nor the Franklin Corp. explicitly plead "reasonable" reliance, it is inferable from the allegations of the complaints read as a whole that Plaintiffs could not have discovered the fraud despite any additional inquiries they may have made. *Cf. Sanders v. Robinson Humphrey/American Express, Inc.,* [1985–1986 Transfer Binder] Fed.Sec. L.Rep. (CCH) p 92,450 at 92,739, 1985 WL 6294 (N.D.Ga. Sept. 11, 1985); *Chandler v.*

*Drexel Burnham Lambert, Inc.,* [1985–1986 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 92,447 at 92,724, 1985 WL 5835 (N.D.Ga. Sept. 11, 1985); *Kolin v. American Plan Corp.,* [1984–1985 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 92,051 at 91,240, 1985 WL 6422 (E.D.N.Y. April 30, 1985) (all holding that a simple allegation of reliance was sufficient for purposes of Rule 9(b)). Accordingly, the allegations of actual reliance are pleaded with the particularity required by Rule 9(b).

### 2. Presumed Reliance

 While proof of actual reliance is required in most cases brought under Rule 10b–5, courts have recognized that in certain circumstances—where inability to prove actual reliance would essentially preclude recovery although the fraud in fact caused the plaintiff's injury—reliance may be presumed. The Supreme Court first acknowledged a presumption of reliance in security fraud cases in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741, 761 (1972).[9] In that case, which was based primarily on omissions rather than on misstatements, the Court held that affirmative proof of reliance is unnecessary where the defendants fail to disclose material facts that reasonably could have been expected to influence the plaintiff's course of action. Under such circumstances "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of the decision...." Of course, should the defendant establish that the plaintiff's decision to purchase or sell would not have been any different even had the defendant disclosed the material facts, then the plaintiff cannot recover. *Lipton v. Documation, Inc.,* 734 F.2d 740, 742 (11th Cir.1984), *cert. denied* 469 U.S. 1132, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985); *Shores v. Sklar,* 647 F.2d 462, 468 (5th Cir.1981) (en banc), *cert. denied,* 459 U.S.

---

**9.** Although the Court did not explicitly state that a "presumption" of reliance was created, courts analyzing the case cite it as creating such a presumption. *See, e.g. Lipton v. Documation, Inc.,* 734 F.2d 740, 742 n. 3 (11th Cir.1984), *cert.*

*denied,* 469 U.S. 1132, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985); *Blackie v. Barrack,* 524 F.2d 891, 906 n. 22 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); *Huddleston*, 640 F.2d at 547–48.

Although Plaintiffs in *Feld* suggest that they are entitled to the *Affiliated Ute* presumption because they allege that the documents disseminated by SAI and the other defendants contain material omissions,[10] the Court cannot agree. Plaintiffs complain that the prospectuses, annual reports, interim reports, press releases, SEC filings and other public documents issued by SAI and the other defendants overstated the Company's sales, earnings, assets and net worth, understated its liabilities and omitted to provide information material to an investor's decision to purchase or sell. Consequently, this is a "mixed" case in that it asserts both misrepresentations and omissions. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722 (11th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 1221, 99 L.Ed.2d 421 (1988); *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 757 (11th Cir.1984). As stated by the court in *Huddleston*—a case where the allegations were virtually identical to those asserted here:

> The defendants did not "stand mute" in the face of a duty to disclose as did the defendants in *Affiliated Ute*. They undertook instead to disclose relevant information in an offering statement now alleged to contain certain misstatements of fact and to fail to contain other facts necessary to make the statements made, in light of the circumstances, not misleading.

640 F.2d at 548 (citation omitted). Where defendants are charged both with material misrepresentations and omissions, the *Affiliated Ute* presumption of reliance does not apply. *Id.; Kirkpatrick*, 827 F.2d at 722; *Cavalier*, 746 F.2d at 756–57.

Plaintiffs in *Feld* and *Adler*, however, contend that they are entitled to invoke a presumption of reliance under the "fraud on the market" theory. This theory is based on the efficient capital market hypothesis which assumes that material information about a company is immediately reflected in the price of the stock. Because the market is interposed between the buyer and seller, there is no need to prove subjective reliance. *Moskowitz v. Lopp*, 128 F.R.D. 624, 630 (E.D.Pa.1989). In this Circuit, the fraud on the market theory was first recognized in *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981) (en banc), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983)[11], which involved a purchase of securities in the undeveloped, primary market context. The former Fifth Circuit in *Shores* held that, in a fraud case brought under sections (1) or (3) of Rule 10b–5, reliance may be established by proof that the plaintiff relied on the integrity of the market rather than on specific misrepresentations. The court distinguished claims brought under Rule 10b–5(2) from those brought under Rule 10b–5(1) or (3), stating that proof of actual reliance is required under section (2), as liability under this provision is premised directly upon the misstatements or omissions, while proof of direct reliance is not required under sections (1) and (3), which are aimed at broader schemes of securities fraud. *Id.* at 469. However, in order for the presumption to apply to the primary market context, a plaintiff must show that the securities could not have been offered on the market at any price "but for" the fraudulent scheme. *Id.* at 464 n. 2; *Ross*, 885 F.2d at 729. "[T]he fraud must be so pervasive that it goes to the very existence of the bonds and the validity of their presence on the market." *Ross*, 885 F.2d at 729. If the plaintiff "proves no more than that the bonds would have been offered at a lower price or a higher rate, rather than that they would never have been issued or marketed,

10. The *Feld* Complaint, for example, states that "[t]he financial statements in SAI's public filings and other statements wholly omitted to state, and did not disclose that (i) SAI had overstated its accounts receivable; (ii) most of its accounts receivable were fictitious; (iii) SAI experienced billing and collection problems with its accounts receivable; (iv) SAI's accounts receivable were either uncollectible or excessively aged."

Consolidated Amended Class Action Complaint, p67.

11. In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted former Fifth Circuit decisions rendered prior to October 1, 1981 as precedent.

he cannot recover." *Shores,* 647 F.2d at 470.

In *Lipton v. Documation, Inc.,* 734 F.2d at 747, the Eleventh Circuit expanded the application of the fraud on the market theory to the open and developed market context, noting that the presumption is most justified in the class action setting where the plaintiffs allege that misrepresentations or omissions affected security prices in a secondary market.[12] In such cases, "it is reasonable to assume that misinformation disseminated into the marketplace will affect the market price." *Id.* at 745–46. Because the stock price is artificially inflated by the alleged misstatements or omissions, the purchasers or sellers of the securities who rely upon this price are defrauded because they buy or sell assuming the stock is based on proper market information. In an action brought in the open market context, a plaintiff may recover simply by a showing that the securities' value has diminished. He need not show that the securities could not have been sold but for the fraud as he must in the primary market context under *Shores. Id.* at 746.[13]

The Supreme Court recently has endorsed the application of the fraud on the market presumption in the open and developed market. *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In *Basic,* shareholders of a publicly traded company sold their stock on the New York Stock Exchange following the company's first misleading public statement denying it was involved in merger negotiations. Following the merger which subsequently occurred, the shareholders brought a class action against the corpora-

tion and its directors, alleging that the defendants had issued three false or misleading public statements in violation of § 10(b) of the 1934 Act and Rule 10b–5. Without distinguishing section (2) of the Rule from sections (1) and (3), the Court held that "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations [ ] may be presumed for purposes of a Rule 10b–5 action." *Id.* at 247, 108 S.Ct. at 992, 99 L.Ed.2d at 218.

Plaintiffs in *Feld* and *Adler* allege that they relied on the integrity of the market in purchasing the SAI securities.[14] Relying on *Shores,* Defendant PMM contends, however, that reliance may not be presumed in these cases under the fraud on the market theory as Plaintiffs' Rule 10b–5 claim states a cause of action only under section (2) of the Rule. To begin with, a review of the complaints in this case reveals that Plaintiffs are not seeking to recover merely for the fraudulent statements and omissions of Defendants pursuant to section (2). Rather, the allegations read as a whole clearly portray a far-reaching scheme to defraud based not only on specific statements and omissions but also on acts, practices and a general course of business conducted by SAI and the defendants, thus implicating both sections (1) and (3). Moreover, even if Plaintiffs were relying solely on Rule 10b–5(2), it is alleged that the SAI securities were traded on a secondary, developed market, not on a primary one like in *Shores.* Under the Supreme Court's analysis in *Basic,* the fraud on the market theory applies to actions asserting the presence of false or misleading statements in

**12.** Directing its attention to the decision in *Shores,* the court stated: "Without impugning the ultimate soundness of the decision in *Shores,* it strikes us as untenable to adopt the fraud on the market theory in a context where its application is most questionable, while precluding its application to transactions in a developed open market, as in this case, where its operation is most justifiable." 734 F.2d at 746.

**13.** As in the *Affiliated Ute* context, a defendant may rebut the presumption of reliance by showing that information sufficient to correct the misstatements was placed in the market in the same way as the misstatements themselves

were. *Basic,* 485 U.S. at 248–49, 108 S.Ct. at 992, 99 L.Ed.2d at 219; *Lipton,* 734 F.2d at 746.

**14.** Plaintiff in *Revere Fund* also states that it relied on the integrity of the market. However, Plaintiff is not entitled to rely on a fraud on the market theory as it did not buy securities in the open market, but rather, in a private dealing. *In re MDC Holdings Securities Litig.,* 754 F.Supp. 785, 804 (S.D.Cal.1990); *Platsis v. E.F. Hutton & Co.,* 642 F.Supp. 1277, 1301 (W.D.Mich.1986), *aff'd,* 829 F.2d 13 (6th Cir.1987), *cert. denied,* 485 U.S. 962, 108 S.Ct. 1227, 99 L.Ed.2d 427 (1988).

documents disseminated to the investing public. The opinion did not distinguish between the various liability provisions of Rule 10b–5. Thus, while it remains unclear whether the *Shores* court's holding, refusing to apply the fraud on the market theory to 10b–5(2) cases in a primary market, remains intact after *Basic*,[15] the presumption is certainly available in section (2) cases where an open market is involved.[16] *See also Lipton,* 734 F.2d 740. Accordingly, the Court concludes that a presumption of reliance may be available to Plaintiffs in *Feld* and *Adler.*

■ Defendants PMM and Bodden further argue that even if the fraud on the market theory is available in a Rule 10b–5(2) situation, it does not apply to these cases as Plaintiffs have not sufficiently alleged that the SAI stock was traded on an efficient market. An efficient market has been defined as one that obtains material information about a company and rapidly reflects that new information in the price of the stock. *Hurley v. Federal Deposit Ins. Corp.,* 719 F.Supp. 27, 34 (D.Mass.1989).[17] Defendants correctly point out that a plaintiff seeking to invoke the fraud on the market theory must allege either that the stock they purchased or sold was actively traded on a well-developed, efficient market or facts which give rise to such an inference.[18] *Greenberg v. Boettch-*

*er & Co.,* 755 F.Supp. 776, 781 (N.D.Ill. 1991); *Cammer v. Bloom,* 711 F.Supp. 1264, 1278 (D.N.J.1989); *Hurley,* 719 F.Supp. at 34. In the absence of an allegation of efficiency, however, courts are divided as to what extent a plaintiff must specifically plead facts of a well-developed market. In *Hurley,* for example, the district court, requiring a rather minimal showing, held that allegations that a bank issued approximately five million shares of stock which were traded on an over-the-counter market with a volume of more than 19.3 million shares traded during the class period were sufficient. 719 F.Supp. at 34. Other courts, to the contrary, have demanded a far more detailed factual statement regarding the nature of the market. In *Cammer,* the district court, discussing the concept of market efficiency at great length, mentioned several examples of facts which, if alleged, would prove helpful in meeting the efficient market requirement: (1) there exists an average weekly trading volume during the applicable period in excess of a certain number of shares, (2) a significant number of securities analysts followed and reported on the company's stock during the applicable period, (3) the stock had numerous market makers and arbitrageurs, (4) the company was entitled to file an S–3 Registration Statement in connection with public offerings or, if ineli-

---

**15.** The Supreme Court has not yet addressed the application of the fraud on the market theory to the primary market context.

**16.** There are sufficient differences between a sale of securities in the open market context and a sale in the primary market to provide continuing validity to the court's decision. For example, it is not as reasonable to assume that misinformation in an undeveloped market is as likely to affect market price. Indeed, in the case of a new issue, the price is set by the offeror and underwriters, not the market. *Lipton,* 734 F.2d at 746.

**17.** The following factors are indicia of an efficient market:

1) One which a large number of persons can buy or sell

2) One which has a relatively high level of activity and frequency, and for which trading information (e.g. price and volume) is widely available. It usually has continuity and liquidity (the ability to absorb a reasonable

amount of trading with relatively small price changes).

3) One which rapidly reflects new information in price.

4 Bromberg & Lowenfels, *Securities Fraud and Commodities Fraud,* § 8.6 (Aug.1988). *See also Cammer v. Bloom,* 711 F.Supp. 1264, 1276 n. 17 (D.N.J.1989) (quoting Bromberg).

**18.** While the Supreme Court in *Basic* did not explicitly approve the Sixth Circuit's requirement that "a plaintiff must allege and prove ... that the shares were traded on an efficient market," 485 U.S. at 248 n. 27, 108 S.Ct. at 992 n. 27, 99 L.Ed.2d at 219 n. 27, courts have interpreted the Court's discussion of the lower court opinion as implicitly approving of this requirement. *See, e.g., Freeman v. Laventhol & Horwath,* 915 F.2d 193, 197–98 (6th Cir.1990); *Greenberg v. Boettcher & Co.,* 755 F.Supp. 776, 781 (N.D.Ill. 1991); *Cammer v. Bloom,* 711 F.Supp. at 1285 n. 34; *Stinson v. Van Valley Development Corp.,* 714 F.Supp. 132, 135 (E.D.Pa.1989), *aff'd,* 897 F.2d 524 (3d Cir.1990).

gible, the ineligibility was the result of timing factors and not because the minimum stock requirements set forth in the Form S–3 instructions were not met, and (5) an historical showing of immediate price response to unexpected corporate events or financial releases. *Id.* at 1285–87. Noting that the main inquiry under the fraud on the market theory "is whether the stock price, *at the time a plaintiff effected a trade,* reflected the 'misinformation' alleged to have been disseminated," the court rejected the defendant's contention that over-the-counter stock per se could not be traded on an efficient market. *Id.* at 1282 (emphasis in original). The Court explained:

> It is not logical to draw bright line tests—such as whether a company is listed on a national exchange or is entitled to register securities on SEC From S–3—to assist fact-finders in determining whether a stock trades in an "open and efficient market." A well established and widely followed company may choose for any number of unrelated reasons not to list itself on a national exchange. Furthermore, there may be a company whose stock trades in an efficient market, but which just missed or recently failed to meet the qualifications for Form S–3 registrants.

*Id.* at 1287. *See also Hurley,* 719 F.Supp. at 33 ("Where the stock is traded is not the crucial issue. The important question is whether the stock is traded in a market

that is efficient …"); *Harman v. LyphoMed, Inc.,* 122 F.R.D. 522, 525 (N.D.Ill. 1988) ("While some over-the-counter stocks no doubt trade in a less developed market than some New York Stock Exchange issues, the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades."). However, reviewing the complaint before it, the court held that allegations that the stock was traded over-the-counter and had approximately 19,000,-000 shares outstanding, held by approximately 1,200 holders, were insufficient to plead market efficiency.[19] *Id.* at 1285. *See also Stinson v. Van Valley Development Corp.,* 714 F.Supp. 132, 137 (E.D.Pa.1989), *aff'd,* 897 F.2d 524 (3d Cir.1990) (where securities traded were a new issue, allegations that the bonds were publicly offered throughout the United States in a diverse market were insufficient to show an open and developed market warranting application of fraud on the market theory); *Greenberg,* 755 F.Supp. at 782 (allegation that secondary market for municipal bonds is efficient did not show an efficiency for the particular bonds purchased).[20]

 Considering the pleadings at issue, the plaintiffs in *Adler* claim that they relied on the integrity of the market in purchasing the SAI stock, yet no where do they allege market efficiency or any other characteristic about the market in which they traded.[21] Even under the more lenient pleading standard employed by the

---

**19.** Although brought as a motion to dismiss, the court treated the motion as a motion for summary judgment under Rule 56, Fed.R.Civ.P., because Defendant PMM asserted, as a matter of law, that the stock traded in an inefficient market. Considering evidence outside the original pleading, the court found there was a genuine issue of material fact concerning the efficiency of the market at issue.

**20.** Several of the cases relied on by Defendants in support of their argument that Plaintiffs' allegations are deficient in that they do not specifically plead the *Cammer* indicia of market efficiency were not before the court on a motion to dismiss, but on a motion for class certification, a motion for summary judgment or on appeal after judgment was entered at trial. *See, e.g., Freeman v. Laventhol & Horwath,* 915 F.2d 193, 193 (6th Cir.1990) (summary judgment); *Abell*

*v. Potomac Ins. Co.,* 858 F.2d 1104, 1121 (5th Cir.1988), *vacated on other grounds,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989) (appeal); *Harman,* 122 F.R.D. at 525 (class certification). Unlike a motion to dismiss, resolution of these various motions requires a court to delve into the sufficiency of the evidence supporting market efficiency—a task this Court declines to undertake at this stage in the proceedings.

**21.** Paragraph 4 of the Complaint does say that the defendants "used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of a national securities exchange" in violation of the law; however, Plaintiffs do not assert that they bought stock on the national exchange nor do they ever claim that the market was open and developed.

court in *Hurley*, Plaintiffs have not met their burden and, thus, may not rely on the fraud on the market theory. Accordingly, as they have failed to plead actual reliance with the requisite specificity and as they are not entitled to a presumption of reliance, their Rule 10b–5 claims must be dismissed. The allegations in *Feld*, on the other hand, are sufficient:

> As of March 1989, SAI had over 21,000,-000 million shares of common stock outstanding which were actively traded on the NASDQ [National Association of Securities Dealers Automated Quotation System] over-the-counter National Market System. During the Class Period ... over 55,000,000 shares of SAI were traded and investors had access to information including "real time" prices at which transactions were actually executed which information is characteristic of, and ensures the development of, an efficient market for a company's stock.

> In addition, SAI disseminated numerous press releases and announcements to the investing public during the Class Period which were carried by the wire services and financial press. Research analysts prepared and disseminated over thirty research reports on SAI during the Class Period.

Consolidated Amended Class Action Complaint, p 5. Not only do Plaintiffs specifically state that the market was efficient, but they also set forth several of the indicia of a well-developed, efficient market mentioned in *Cammer*. Accordingly, at least at this juncture in the proceedings, the plaintiffs in *Feld* may proceed on the fraud on the market theory of presumed reliance.

### B. *Scienter*

■ The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668, 677 n. 12 (1976). In this Circuit, scienter may be established by proof of misconduct which is knowing or extremely reckless in that it reflects an extreme departure from the standards of or-

dinary care. *Huddleston*, 640 F.2d at 545. Although Rule 9(b) provides that the state of mind of a defendant in a fraud case may be averred generally, courts have required plaintiffs nevertheless to supply some factual basis in support of their allegation of intent. *See Ross v. A.H. Robbins Co.*, 607 F.2d 545, 558 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Posner v. Coopers & Lybrand*, 92 F.R.D. 765, 769 (S.D.N.Y.1981), *aff'd*, 697 F.2d 296 (2d Cir.1982). PMM and the Outside Directors argue that Plaintiffs have failed to adequately set forth scienter in their complaints. The Court cannot agree.

■ As for PMM, Plaintiffs state that PMM knowingly or recklessly failed to audit and review SAI's financial statements in accordance with generally accepted auditing standards ("GAAS") and generally accepted accounting principles ("GAAP") and then go on to explain in detail the exact standards violated and the adverse effects of the violations. These opinions and reports ultimately were included in SAI's 10–K Reports filed with the SEC and SAI's Annual Reports distributed to stockholders for fiscal years 1986, 1987 and 1988. While allegations that an accounting firm violated GAAS or GAAP do not of themselves create an inference of scienter in the absence of other facts suggesting the accountants knew or were reckless in not knowing of the fraud, *Friedman v. Arizona World Nurseries Ltd. Partnership*, 730 F.Supp. 521, 532 (S.D.N.Y.1990), the Court concludes that Plaintiffs have alleged ample facts from which one may infer that PMM intended to participate in the Project. The *Feld* Complaint is representative:

> PMM knew or was reckless is not knowing, based upon its annual audits or SAI and its quarterly reviews of SAI's interim financial statements and based upon the growth of SAI's accounts receivable in its investigative services activities as a percentage of overall receivables and as compared to the growth of SAI's investigative services revenues that SAI's statements of revenues and receivables were overstated. In its audits and reviews, PMM failed to perform sufficient tests of

"collectibility" [sic] of the reported accounts receivable ... The facts known to PMM gave PMM reason to believe that there were a substantial number of accounts receivable with inaccuracies or irregularities.... The huge amount of accounts receivable SAI must write off, *at least $45 million,* indicates the scope of defendants' fraud. PMM was, at the minimum, grossly reckless in its failure to discover that nearly two-thirds of SAI's accounts receivable were required to be written off.

Consolidated Amended Class Action Complaint, p 64(a), 65 (emphasis in original). These allegations clearly suggest that PMM may indeed have had a strong indication that something was seriously amiss at SAI and certainly provide PMM with fair notice of Plaintiffs' claims.

 The allegations asserted against the Outside Directors are similarly well-pleaded. Plaintiffs assert that these defendants were an integral part of the fraudulent scheme in that they rendered substantial assistance in preparing, reviewing and approving the false and misleading documents of SAI which were provided to the plaintiff-investors. In addition, by virtue of their Board membership, they are alleged to have known or to have been reckless in not knowing of the Project. Moreover, in each case, with the exception of *B.F. Enterprises,* Plaintiffs allege that the Outside Directors were "controlling persons" within the meaning of § 20 of the 1934 Act.[22] Where a plaintiff alleges controlling person liability, he need not plead scienter. *Polycast Technology Corp. v. Uniroyal, Inc.,* [1988–1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 94,005 at 90,-696, 1988 WL 96586 (S.D.N.Y. Aug. 25, 1988). Finally, as each of these individuals was a member of the Board and owned stock in the Company, each conceivably desired the success of the fraudulent scheme. While motive is not required to establish scienter, proof of motive is one means of showing that intent was in fact present. *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987),

*cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

### C. *Loss Causation*

 Defendant Bodden asserts that Plaintiffs in *Feld, Adler* and *B.F. Enterprises* have failed to allege the requisite causation between his alleged perpetration of the fraud and Plaintiffs' losses. His argument is without merit. In this Circuit, a plaintiff must prove both actual causation ("transaction causation") and proximate causation ("loss causation") in order to prevail on his § 10(b) claim. *Bruschi v. Brown,* 876 F.2d 1526, 1530 (11th Cir.1989); *Rousseff v. E.F. Hutton Co.,* 843 F.2d 1326, 1329 & n. 2 (11th Cir.1988). Transaction causation is demonstrated by proof that the defendant's misrepresentations induced the plaintiff to make the investment. *Bruschi,* 876 F.2d at 1530. Loss causation, on the other hand, requires the plaintiff to "prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Id.* (quoting *Huddleston,* 640 F.2d at 549). Thus, a supervening factor, such as a general decline in the market that reduces the plaintiff's investment unrelated to the defendant's misconduct, will destroy causation. A plaintiff need not show that the defendant's conduct was the sole and exclusive cause of his injury, but merely must establish that it was a substantial factor. *Id.* at 1531.

 Plaintiffs here have stated both loss and transaction causation. They claim that they bought the SAI stock as a result of Defendants' misrepresentations and omissions, thus pleading transaction causation. In addition, they assert that, as a result of the Board-appointed Special Committee's announcement that receivables and revenues were grossly overstated and PMM's subsequent withdrawal of its reports issued in connection with its audits, the stock plummeted and ultimately became virtually worthless. Although Defendants may attempt to show during the course of discovery that the stock price

---

**22.** For further discussion on § 20 liability *see*

*infra* section I.F.: *Role of Each Defendant.*

plunged due to general market conditions or for some other reason unrelated to their allegedly wrongful conduct, Plaintiffs' allegations are more than sufficient to connect the fraudulent scheme to the decline in the value of their stock for purposes of a motion to dismiss.

### D. *Aiding and Abetting Claim Against PMM*

▬ In addition to charging PMM with a primary violation of Rule 10b–5, three of the six complaints [23] allege that PMM aided and abetted the officers and directors in carrying out the overall fraudulent scheme. Aiding and abetting is established by showing that (1) another party violated the securities laws, (2) the accused is generally aware of his role in the improper activity, and (3) the accused aider and abettor knowingly rendered substantial assistance. *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1045 (11th Cir.1986), *cert. denied*, 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir.1975). Whether the assistance was "substantial" depends on the totality of the circumstances. *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir.1985). Conceding that Plaintiffs have alleged the securities violations of the SAI officers and directors, PMM argues that Plaintiffs' have failed to plead that PMM possessed the requisite state of mind or that PMM rendered knowing and substantial assistance in furtherance of the fraud.

▬ Defendant correctly notes that in order for one to be secondarily liable for a Rule 10b–5 violation, he must have an actual awareness of his part in the fraud. As explained by the court in *Woodward:* "Knowledge may be shown by circumstantial evidence, or by reckless conduct, but the proof must demonstrate actual awareness of the party's role in the fraudulent scheme." 522 F.2d at 96. Here, Plaintiffs

allege that PMM knowingly or recklessly disregarded generally accepted accounting and auditing standards, causing it to issue grossly misleading reports and opinions concerning SAI's financial statements. If these allegations are proven, a fact-finder may, considering all the circumstances, conclude that PMM had actual awareness that its actions furthered an overall improper activity.[24]

▬ As to pleading that PMM knowingly and substantially assisted the securities violations, the complaints state:

> PMM participated in or gave substantial aid and assistance to the fraud by SAI and the Individual Defendants ... by knowingly permitting SAI to maintain improper accounting practices and financial reporting practices ... [and by] issuing opinions on audited financial statements and reports on reviews of SAI's interim financial statements, thereby enabling SAI and the Individual Defendants to misrepresent the facts as to SAI's reported operating results for FY 1986, FY 1987 and FY 1988 and for each interim quarter thereof and for the quarters ended September 30, 1988 and December 31, 1988.

*Feld* Consolidated Amended Class Action Complaint at p 84; *Franklin* Complaint at p 81; *Revere Fund* Complaint at p 81. It is conceivable that a fact-finder hearing evidence supporting these allegations of affirmative conduct on PMM's part may conclude that the accounting firm acted with the desire to aid the success of the Project and, in fact, substantially assisted the fraud by its actions. *See Abell*, 858 F.2d at 1127 (interpreting the *Woodward* scienter requirement as compelling proof both that the alleged aider and abettor generally understood how its actions aided in promoting the fraud and that the offender desired to help the fraud succeed). Thus, the complaints sufficiently set forth a cause of

---

**23.** *Feld, Revere,* and *Franklin.*

**24.** While the complaints read as a whole sufficiently set forth the second factor in the aiding and abetting test, Plaintiffs do state in their Third Claim for Relief that "PMM knew or

should have known of SAI's and the Individual Defendants' violations." Under *Woodward* and its progeny, Plaintiffs will ultimately have to establish that PMM did indeed know of the overall illegal activity.

action for secondary liability under Rule 10b–5.[25]

### E. *Outside Directors' Duty to Disclose*

 The Outside Directors argue that Plaintiffs' Rule 10b–5 claims in *Revere* and *Franklin* should be dismissed against them as they had no duty disclose the alleged misrepresentations of the Management Defendants. Specifically, Defendants contend that a duty to disclose arises under Rule 10b–5 only when one is a fiduciary; since they are not fiduciaries of Plaintiffs, as Plaintiffs are creditors of SAI, no duty arises. While Defendants are correct in noting that directors of a corporation do not stand in a fiduciary relationship with the company's creditors, and thus owe them no duty of disclosure, *Metropolitan Securities v. Occidental Petroleum,* 705 F.Supp. 134, 141 (S.D.N.Y.1989); *S.E.C. v. Rogers,* 790 F.2d 1450, 1459 (9th Cir.1986) (citing *Strong v. France,* 474 F.2d 747, 752 (9th Cir.1973)), the Outside Directors have mistakenly characterized Plaintiffs' case as one involving solely the failure to disclose. Contrary to Defendants' position, the allegations supporting Plaintiffs' Rule 10b–5 claims are not based exclusively on the Outside Directors' failure to discover the fraud and take steps to provide accurate, correcting information to Plaintiffs. Rather, these defendants are accused of actively participating in the fraudulent scheme to the same extent as the Management Defendants.[26] An outside director may be liable under Rule 10b–5 for actively participating in securities fraud. *See, e.g., Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 119 (2d Cir.1982); *Lanza v. Drexel,* 479 F.2d 1277, 1289 (2d Cir.1973) (en banc). *See generally Robinson v. Heilman,* 563 F.2d 1304 (9th Cir.1977). Should Plaintiffs' proof of their security claims ultimately rest on the Outside Directors' failure to discover and disclose the illegal actions of the other defendants to Plaintiffs, they will not succeed in their actions against the Outside Directors. At this stage, however, their claims are sufficient.

### F. *Role of Each Defendant*

 Defendants all urge the Court to dismiss the federal securities law counts

---

**25.** Defendant also argues that the aiding and abetting claims are not set forth with the necessary particularity to satisfy Rule 9(b), essentially contending that Plaintiffs have failed to provide a factual basis that PMM was aware of the fraud by demonstrating motive on PMM's part. The Court concludes, however, that the extensive allegations in reference to PMM are adequate to satisfy the Rule.

Plaintiffs also allege that PMM aided and abetted other defendants' violations of § 20 of the 1934 Act. As PMM points out, however, there is no cause of action for secondary liability under this section. *In re Investors Funding Corp. of N.Y. Sec. Litig.,* 523 F.Supp. 533, 543 (S.D.N.Y.1980), *aff'd sub nom. Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57 (2d Cir.1985). In order to establish aiding and abetting, a plaintiff must first demonstrate there has been a primary violation of the securities laws. *Woods,* 765 F.2d at 1009. Controlling person liability under § 20 itself, however, is premised on *secondary* liability. *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1118 (5th Cir.1980). Accordingly, proof that other defendants violated § 20 alone cannot provide a basis for PMM's secondary liability; therefore, this portion of Count III in *Feld, Franklin* and *Revere* must be dismissed.

**26.** Both complaints at issue state:

Each of the individual Defendants knew, or was reckless in failing to know, of the materi-al omissions and misstatements contained in the financial reports and other documents and press releases issued by SAI. Because of their Board membership or their executive and managerial positions with the Company, the Individual Defendants (i) knew or had access to or were reckless in not ascertaining information concerning the true financial condition of the Company; or (ii) rendered substantial assistance in drafting, reviewing and/or approving the false and misleading statements and financial reports and other documents and press releases disseminated to the public.

By reason of the conduct alleged herein, defendants, and each of them, knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, in that they (i) employed devices, schemes and artifices to defraud, (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make statements, in light of the circumstances under which they were made, not misleading, and (iii) engaged in acts, practices and a course of business that operated as a fraud and deceit upon plaintiff in connection with its purchases of SAI's securities as previously described.

*Franklin,* p67, p68; *Revere,* p67, p68.

against them for Plaintiffs' failure to allege each individual defendant's involvement in the fraud with sufficient particularity to satisfy Rule 9(b).[27] Accusing Plaintiffs of "tarring everyone with the same brush," they claim that Plaintiffs must inform each of them of the specific wrongful acts they allegedly committed in furtherance of the Project. Defendants' recitation of the law is not altogether accurate. While the general rule is that where multiple defendants are involved, the complaint must distinguish among them and specify their respective roles, *First American Bank and Trust by Levitt v. Frogel*, 726 F.Supp. 1292, 1295 (S.D.Fla.1989), no specific connection between the fraudulent representations and particular defendants is necessary in cases of corporate fraud brought against insiders and affiliates where the false information is disseminated in group-published documents. As long as the complaint describes the fraudulent acts in detail and provides the defendants with sufficient information to respond, a court may presume that these acts have been committed collectively by the officers and directors. *Id.; In re U.S. Oil and Gas Litig.*, 1988 WL 28544 at * 2, 1988 U.S. Dist. LEXIS 2217 at 6; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987); *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986). This relaxed standard for Rule 9(b) purposes has arisen because of the recognition that it may be exceedingly difficult to attribute particular fraudulent conduct to each individual defendant. *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir.1989). Thus, in corporate fraud cases involving group-published information, a plaintiff need only plead the alleged misrepresentations with particularity and, where possible, each individual defendant's role in the misrepresentations. *Id.; Frogel*, 726 F.Supp. at 1295. In the cases at issue, Plaintiffs have described in exacting detail the misrepresentations allegedly made in the public documents and SEC filings, including the date the documents were issued. The complaints, therefore, are more than sufficient as to the Management Defendants—Bodden and Logal.

 The Court does note, however, that where outside directors are concerned, as here, some courts require plaintiffs to plead additional facts demonstrating that the group-published information presumption should apply to these individuals. *See, e.g., In re Rospatch Securities Litig.*, 760 F.Supp. 1239, 1255 (W.D.Mich.1991); *Klein v. King*, 1990 WL 61950 at 13, 1990 U.S. Dist. LEXIS 5392 at 34–35 (N.D.Cal. Mar. 27, 1990); *Daisy Systems Corp. v. Finegold*, 1988 WL 166235 at 5, 1988 U.S. Dist. LEXIS 16765 at 12–13 (N.D.Cal. Sept. 20, 1988). Courts following this approach have applied the presumption where the outside directors stand in a special relationship with the corporation, such as where they are considered "control persons" under the federal securities laws. *See, e.g., Klein*, 1990 WL 61950 at 13, 1990 U.S. Dist. LEXIS 5392 at 34–35. Under § 20 of the 1934 Act, 15 U.S.C. § 78t(a), and § 15 of the 1933 Act, 15 U.S.C. § 77o, one who "controls" a person who has violated the applicable Act may himself be held jointly and severally liable for the alleged violation.[28] A director of a corporation is not automatically liable as a controlling person by virtue of his position. *Wool*, 818 F.2d at 1441; *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir.1984); *Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir.1981); *Hemming v. Alfin Fragrances, Inc.*, 690 F.Supp. 239, 245 (S.D.N.Y.1988). Rather, there must be some showing that the defendant had power, directly or indirectly, to influence the policy and decisionmaking process of one

---

**27.** Defendants extend this argument to the security claims brought under § 12(2) of the 1933 Act and the RICO claims.

**28.** Section 20 provides that any person who controls a person liable under any section of the 1934 Act is jointly and severally liable for the violation, unless the controlling person "acted in good faith" and "did not directly or indirectly

induce the act or acts constituting the violation." 15 U.S.C. § 78t(a).

Section 15 imposes joint and several liability on those who control persons liable under enumerated provisions of the 1933 Act unless they "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

who violated the Act, such as through ownership of voting stock, by contract or through managerial power. *Wool,* 818 F.2d at 1440. *Cameron v. Outdoor Resorts of America, Inc.,* 608 F.2d 187, 195 (5th Cir.1979), *modified on other grounds,* 611 F.2d 105 (5th Cir.1980); *Ferland v. Orange Groves of Florida, Inc.,* 377 F.Supp. 690, 707 (M.D.Fla.1974); *Burgess,* 727 F.2d at 832. Where the defendants are a narrowly-defined group of corporate officers charged with the day-to-day operations of a public corporation, however, it is reasonable to presume that they had the ability to control those transactions giving rise to a securities violation. *Wool,* 818 F.2d at 1441. Accordingly, it is sufficient for the plaintiff to allege who the defendants allegedly controlled and what acts or status demonstrate their ability to control. *Id.* at 1441–42. In the case of outside directors, on the other hand, a plaintiff must plead the outside director's authority to control the primary violation. *See Ballan v. Wilfred Amerian Educational Corp.,* 720 F.Supp. 241, 254 (E.D.N.Y.1989); *Index Fund, Inc. v. Hagopian,* 609 F.Supp. 499, 506 (S.D.N.Y.1985).[29]

■■■■■ Recognizing the policy concerns in favor of encouraging individuals to serve on the board of directors of corporations, this Court endorses the view that additional facts must be alleged in order to group outside directors with management defendants for purposes of relaxing the Rule 9(b) particularity pleading requirement. Even under this more stringent standard, however, the allegations pled here are suf-

ficient.[30] Plaintiffs in each case have stated that the Outside Directors were control persons of SAI who directly or indirectly controlled the conduct of the Company's business as well as the contents of the various financial statements and reports disseminated to Plaintiffs. In addition they have stated that the Directors knew of, or were reckless in not knowing of, the misstatements contained in the financial statements, other documents and press releases, and that they perhaps rendered assistance in drafting, reviewing and approving these misrepresentations. The roles of the Outside Director Defendants need not be set forth with any greater specificity than Plaintiffs have done here in order to satisfy Rule 9(b).

## II. § 12(2) OF THE SECURITIES ACT OF 1933

■■■■■ Plaintiffs in *B.F. Enterprises* and *ILP* have brought a claim against all Defendants for violations of § 12(2) of the Securities Act of 1933. Liability under this statute is limited to persons who offer or sell a security by means of a prospectus, registration statement, or other oral communication related to a security offering.[31] Courts interpreting this provision have confined its application to initial offerings of securities, finding that it was not intended to pertain to secondarily traded securities. *See, e.g., Leonard v. Stuart–James Co.,* 742 F.Supp. 653, 658 (N.D.Ga.1990); *Milos,* 717 F.Supp. at 1522; *Strong v. Paine Webber, Inc.,* 700 F.Supp. 4, 5 (S.D.N.Y.1988);

---

**29.** Because fraud is not an element of control person liability, allegations of control are not subject to the Rule 9(b) particularity requirement. *Stoller v. Baldwin–United Corp.,* [1984 Transfer Binder] Fed.Sec.L.Rep. (CCH) p91,678 at 99,428 n. 7, 1984 WL 828 (S.D.Oh. Sept. 19, 1984). *But see Walker v. Cardinal Sav. and Loan Ass'n,* 690 F.Supp. 494, 501 (E.D.Va.1988).

**30.** No outside directors have been sued by the plaintiffs in *Adler* and *ILP.*

**31.** Section 12(2) provides:
Any person who—
(2) offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral

communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

*Ralph v. Prudential–Bache Securities, Inc.,* 692 F.Supp. 1322, 1324 (S.D.Fla.1988). Defendants Bodden, Schaefer and PMM each move to dismiss the § 12(2) counts.

Bodden moves to dismiss these claims, contending that he is not a "seller" under the Act. The Supreme Court, in *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), held that one may be a "seller" under § 12(1) of the 1933 Act if he passes title or other interest in a security to a buyer for value or solicits a purchase of a security. *Id.* at 642–43, 108 S.Ct. at 2076–77. While not defining "solicit" in detail, the Court did say that one who is "motivated at least in part by a desire to serve his own financial interests or those of the securities owner" may be liable. *Id.* at 647, 108 S.Ct. at 2079. On the other hand, a person whose sole motivation is to benefit the buyer is not subject to liability. *Id.* Courts reviewing the Supreme Court's analysis in *Pinter* have determined that the standard for ascertaining liability as a "seller" under § 12(1) applies equally to liability under § 12(2) of the Act. *See, e.g., Craftmatic Securities Litig. v. Kraftsow,* 890 F.2d 628, 635 (3d Cir.1989); *Moore,* 885 F.2d at 536; *Beltram v. Shackleford, Farrior, Stallings & Evans,* 725 F.Supp. 499, 500 (M.D.Fla.1989). Applying this analysis, the Court finds that the complaint in *ILP* adequately alleges that Bodden was a seller of the SAI securities. Plaintiff details Bodden's positions with the Company and states that he maintained control over the day-to-day management of the business, including involvement with various financial statements and reports. In addition, Plaintiff contends that Bodden was present at two meetings held in March and June of 1988 where false representations were made to induce ILP to purchase SAI common stock and warrants and certain notes for $25 million. Moreover, Plaintiff states that the Individual Defendants (including Bodden) solicited the above purchase in order to serve their own financial interests as well as those of SAI.

■ As for the § 12(2) claim in *B.F. Enterprises,* Bodden's argument that the claim must be dismissed because Plaintiffs fail to assert that he is a seller is without merit. Plaintiffs seek recovery against the Individual Defendants under § 12(2) on the basis that they were "controlling persons" of SAI, the seller of the securities, under § 15 of the Act. One may be liable for a § 12(2) violation as a "controlling person" even though he himself is not a "seller" under that provision. *See, e.g., Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1578 & n. 32 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). The Court concludes that the allegations of Bodden's control status are sufficient. Plaintiffs allege that he was the Chairman of the Board of Directors and Secretary of SAI and that, because of his position as an officer and director of SAI, he was "able to and did, directly or indirectly, control the conduct of its business as well as the contents of the various financial statements and reports disseminated to plaintiffs." Complaint at p 12. Similarly, despite Defendant Schaefer's argument to the contrary, the allegations of control concerning this Outside Director are sufficient as the Court concluded in the preceding section. In addition to the general allegations of control made in reference to the Outside Directors as a group, Plaintiffs further assert that Defendant Schaefer was a member of the Audit Committee of the Board who oversaw and supervised the activities of the other directors and was personally charged with examining the Company's accounting, reporting and disclosure practices and for reviewing the financial statements. Thus, Plaintiffs' § 12(2) claim against Bodden and Schaefer shall not be dismissed.[32]

■ Finally, the Court considers PMM's argument that it cannot be liable as an aider and abettor under § 12(2). Courts have routinely held that aiding and abetting liability does not exist under this statute. *See, e.g., Craftmatic Securities Li-*

---

**32.** Defendant Schaefer's argument that Count II should be dismissed because it was brought pursuant to § 12(2) as opposed to § 15 is without merit, as Plaintiffs do explicitly state that the defendants are liable under § 12(2) because they were control persons of SAI.

*tig.*, 890 F.2d at 636–37; *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1017 (2d Cir.1989); *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 942 (7th Cir. 1989); *Abell*, 858 F.2d at 1114–15; *In re VMS Securities Litig.*, 752 F.Supp. 1373, 1402 (N.D.Ill.1990); *Dawe v. Main Street Management Co.*, 738 F.Supp. 36, 38 n. 6 (D.Mass.1990). *But see Drexel, Burnharm, Lambert, Inc. v. American Bankers Ins. Co. of Florida, Inc.*, [1989–1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 94,835 at 94,532, 1989 WL 168012 (E.D.N.C. Nov. 8, 1989). Accordingly, Count II of *B.F. Enterprises* is dismissed to the extent that it seeks recovery from PMM.

## III. RICO

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, permits "any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]" to bring a civil suit against the violator. Section 1964(c). One may be liable under the RICO statute if he uses or invests income derived "from a pattern of racketeering activity" to acquire an interest in or to operate an enterprise engaged in interstate commerce, § 1962(a); if he acquires or maintains an interest in or control of such an enterprise "through a pattern of racketeering activity," § 1962(b); if, while employed by or associated with such an enterprise, he conducts or participates in the conduct of its affairs "through a pattern of racketeering activity," § 1962(c); or if he "conspir[es] to violate any of the provisions of subsections (a), (b), or (c)," § 1962(d). RICO defines "racketeering activity" to mean "any act or threat involving" enumerated state-law crimes, any "act" indictable under certain specified federal statutes, and various federal "offenses." Section 1961(1). In order to establish a "pattern of racketeering activity," the statute requires proof of "at least two acts of racketeering activity" within a 10–year period. Section 1961(5). A person found to have violated RICO in a civil action is liable for treble damages, costs and attorney's fees. Section 1964(c). In the actions pending before the Court, Plaintiffs allege that certain defendants vi-

olated either some or all of the four provisions of § 1962. Defendants move to dismiss these Counts in their entirety on various grounds.

### A. Predicate Acts and "Pattern of Racketeering Activity"

■ The Management Defendants move to dismiss the RICO counts of the pending complaints on the grounds that they fail to set forth the requisite predicate acts and pattern of racketeering activity. Section 1961(1) defines "predicate acts" to include mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343 and fraud in the sale of securities. In order to plead a cause of action for mail fraud, a plaintiff must allege that the defendant (1) intentionally participated in a scheme to defraud him of his property, and (2) used the mails in furtherance of that scheme. *U.S. v. Downs*, 870 F.2d 613, 615 (11th Cir.1989). Similarly, in order to state a claim for wire fraud, a plaintiff must allege (1) a scheme to defraud, and (2) the use of an interstate wire communication in furtherance of that scheme. *Belt v. U.S.*, 868 F.2d 1208, 1211 (11th Cir.1989). Intent to defraud is an essential element of both causes of action. *See, e.g., O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 226 n. 7 (S.D.N.Y.1989) (mail and wire fraud); *Grant v. Union Bank*, 629 F.Supp. 570, 576 (D.Utah 1986) (mail and wire fraud); *Beck*, 820 F.2d at 49–50 (mail and wire fraud). The elements for a security violation under § 12(2) of the 1933 Act and § 10(b) of the 1934 Act are described in detail above. Despite Defendants' urging to the contrary, the complaints at issue set forth, in a manner sufficient to meet Rule 9(b)'s particularity requirement, that Defendants violated each of these provisions on numerous occasions.

■ Similarly, the allegations satisfactorily state a pattern of racketeering activity. While the statutory definition of this term does not offer much guidance, the Supreme Court has recently advanced that "to prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are related, and that

they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195, 196 (1989). This two prong analysis is referred to as the "continuity plus relationship" test. *Id.* Although once thought otherwise by certain judges and commentators, it is now clearly the law that the presence of one scheme alleging two or more underlying predicate acts may constitute a pattern under RICO. One may satisfy the "relatedness" prong of the two-part test by showing " 'criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)).

Defendants do not dispute that Plaintiffs have met the relatedness requirement. Rather, in arguing that no pattern of racketeering exists, they contend that Plaintiffs fail to allege the requisite "continuity." A continuity of predicate acts may be established by showing either that the acts in themselves have been continuous—"closed-ended" continuity—or that the defendant's conduct poses "a threat of repetition" in the future—"open-ended" continuity. *Id.* at 2902. Closed-ended continuity is demonstrated by a showing of a "series of related predicates extending over a substantial period of time." *Id.* Acts committed over a few weeks or months without a future threat, however, are not sufficient. *Id.* In order to establish open-ended continuity, on the other hand, a party must show that past criminal conduct is likely to occur in the future. This threat of illegal action may be demonstrated in a variety of ways. For example, if the predicate acts "involve a distinct threat of long-term racketeering activity, either implicit or explicit," continuity may exist. *Id.* Similarly, where the "predicates are a regular way of conducting defendant's ongoing legitimate business" or "are part of an ongoing entity's regular way of doing business," such as "where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes," they may establish the presence of an open-ended scheme. *Id.* Plaintiffs here have alleged continuity of both a closed-ended as well as an open-ended nature. Each dissemination of an allegedly false financial statement, press release or offering circular and each fraudulent statement made in a face-to-face setting constitutes a violation of one or more predicate acts. These alleged misstatements to public and private investors occurred repeatedly over a several year period, all in furtherance of the Project. In addition, had the alleged scheme not been uncovered, it is reasonable to infer that it would have continued for quite some time into the future. Accordingly, the RICO counts sufficiently plead a pattern of racketeering activity.[33]

## B. § 1962(a) Claims

### 1. Primary Claim

Defendants Bodden, Schaefer and Logal move to dismiss those claims asserting violations of § 1962(a). Bodden contends that the allegations are insufficient in that they do not state that he invested any income derived from racketeering activity in the enterprise. While Bodden is correct in noting that the plain language of § 1962(a) requires a plaintiff to plead that a defendant invested income derived from a pattern of racketeering activity to acquire an interest in, establish, or operate an enterprise, he mistakenly contends that Plaintiffs have not done so here. Plaintiffs accuse Bodden of being a part of an enterprise which has violated the RICO statute by obtaining monies from the investing public through fraudulent securities offerings and sales of stock and investing this income in the acquisition, establishment or operation of the enterprise. Plaintiffs do not simply track the language of § 1962(a) as suggested by Bodden; their allegations

---

**33.** Rule 9(b) applies to the predicate acts alleged in these cases as they all involve allegations of fraud. *Moore*, 885 F.2d at 541; *Beck*, 820 F.2d at 49–50. For the same reasons mentioned above in the Court's discussion of the federal securities claims, the Court also finds the RICO allegations sufficient to satisfy Rule 9(b). *See Durham*, 847 F.2d at 1511.

provide a detailed factual account of how the enterprise functioned to accomplish its purposes.

■ In addition, Defendants argue that § 1962(a) provides a cause of action only for those injured as a result of the investment of racketeering income in an enterprise, and not for those harmed by the underlying acts of racketeering themselves. As Plaintiffs merely allege that they were harmed by the commission of the predicate acts, Defendants contend, their claims cannot stand. Courts are in disagreement over whether a plaintiff must plead an injury proximately caused by the investment of income derived from a pattern of activity. *Compare Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837 (4th Cir.1990) (en banc) (holding a plaintiff may recover for injury caused by predicate racketeering acts alone) *with Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir.1990); *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 494 (6th Cir.1990); *Rose v. Bartle*, 871 F.2d 331, 357–58 (3d Cir.1989); *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149 (10th Cir.), *cert. denied*, 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989) (all holding that the investment or use of racketeering income, not the predicate acts alone, must be the cause of compensable injury). Having considered both approaches, this Court concludes that those courts requiring a causal nexus between the investment or use of the racketeering income and the plaintiff's injury adopt the preferable view. Section 1962(a) provides in pertinent part:

> It shall be *unlawful* for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... *to use or invest*, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). While not prohibiting the mere receipt of racketeering income, the statute does forbid a person who has received such income from *investing or using* it in the proscribed manner. Section 1964(c) provides a civil remedy only to those persons harmed "by reason of a violation of section 1962." Thus, pleading injury from the racketeering acts, without more, is insufficient to state a claim under § 1962(a), as that provision does not prohibit those acts. *Grider*, 868 F.2d at 1149. Moreover, as the Tenth Circuit has noted: "[T]he general principle that RICO is to be accorded a liberal interpretation cannot justify expanding section 1962(a) beyond the limits of that subsection's own language." *Id.* at 1150. *See also* Note, *The Fourth Circuit Rejects Civil RICO's Investment Use Rule: Busby v. Crown Supply, Inc.*, 69 N.C.L.Rev. 770, 785–92 (1991) (criticizing the Fourth Circuit's approach).

■ Even applying this stricter test, however, Plaintiffs have satisfied their pleading burden. It is alleged that Defendants derived income (both as officers and directors of SAI as well as from the increased value of their own stock in the Company) from their involvement in the Project. By investing this income back into the enterprise, Defendants were able to guarantee the continuance of the scheme and the growth of SAI, which ultimately resulted in the artificially inflated price of SAI's financial picture. Plaintiffs, allegedly acting in reliance on the stated value of the Company, purchased SAI securities and ultimately suffered injury.

### 2. Aiding and Abetting Claim against PMM

■ Plaintiffs in *B.F. Enterprises* have charged PMM with aiding and abetting other Defendants' § 1962(a) violations. One may be civilly liable for a RICO violation if he aids and abets the commission of two predicate acts, provided of course that all of RICO's other requirements have been met. *Petro-Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1356 (3d Cir.1987). To establish liability as an aider and abettor, a plaintiff must show for each predicate act that the defendant was associated with the wrongful conduct, participated in it with the intent to bring it about, and sought by his actions to make it suc-

ceed. *U.S. v. Broadwell*, 870 F.2d 594, 608 (11th Cir.), *cert. denied*, 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed.2d 85 (1989); *Armco Indus. Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 485 (5th Cir.1986); *First City Nat'l Bank and Trust Co. v. Federal Deposit Ins. Corp.*, 730 F.Supp. 501, 508 (E.D.N.Y.1990). Proof of "mere negative acquiescence" in the act is not enough; there must be evidence of "an overt act designed to aid in the success of the venture." *Armco*, 782 F.2d at 485 (quoting *U.S. v. Longoria*, 569 F.2d 422, 425 (5th Cir.1978)). *See also Laterza v. American Broadcasting Co.*, 581 F.Supp. 408, 412 (S.D.N.Y.1984). Thus, a defendant's failure to expose the existence of a fraudulent scheme of which he is aware does not rise to the level of aiding and abetting. *Armco*, 782 F.2d at 486. In addition, to be liable for aiding in mail, wire, or security fraud—all crimes of specific intent—the defendant must have shared the principal's criminal intent. *Id.; First City Nat'l Bank*, 730 F.Supp. at 509; *WAIT Radio by Rosenfield v. Price Waterhouse*, 691 F.Supp. 102, 108 (N.D.Ill.1988). While recognizing that the language of the statute provides a cause of action against an aider and abettor [34] by making such person a "principal," PMM argues that Plaintiffs do not adequately set forth that PMM intended to further an act of mail, wire, or securities fraud.

▪ Plaintiffs here allege that PMM aided and abetted the officers and directors in a variety of ways. They contend that PMM consented to the inclusion of its reports on SAI's false financial statements in registration statements and other reports that SAI filed with the SEC. In addition, Plaintiffs point to a number of incidents where PMM representatives knowingly concealed the true financial condition of SAI. For example, there is an allegation that PMM employees assisted with the 1987 Private Placement by responding favorably to investor inquiries about SAI's accounting practices and financial status. Along similar lines, Plaintiffs allege that PMM representatives confirmed the amount of work-in-progress reported by SAI as accounts receivable upon request by Gateway during its due diligence investigation conducted in reference to the Bridge Financing. Thus, not only have Plaintiffs asserted that PMM had knowledge of the Project, but they also contend that PMM knowingly took affirmative actions to facilitate and assist the fraudulent scheme. Accordingly, the allegations sufficiently set forth that PMM had the requisite intent to aid and abet a § 1962(a) violation by assisting in at least two underlying predicate acts of fraud.[35]

▪ PMM further argues, however, that Plaintiffs' allegations are further deficient in that they do not state that PMM invested money derived from a pattern of racketeering activity into a RICO enterprise. The Court finds merit to this contention. One who aids and abets a violation of § 1962(a) is considered a principal under that provision by means of 18 U.S.C. § 2(a). A principal is only liable under § 1962(a), however, when he illegally obtains monies from a pattern of racketeering activity *and* invests these monies or a portion thereof into an enterprise. Here, PMM is not al-

---

**34.** Section 1962(a) provides for liability against "principal[s] within the meaning of section 2, title 18, United States Code." Section 2(a) states that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

**35.** PMM also moves to dismiss the § 1962(c) aiding and abetting claim in *B.F. Enterprises* on the grounds that this Court should not recognize such a cause of action and because, even if this Court were to recognize aiding and abetting liability under this provision, Plaintiffs have failed to allege that PMM aided and abetted two predicate acts. Those courts which have considered whether secondary liability exists under § 1962(c) have uniformly held that a claim for aiding and abetting exists. *See, e.g., Armco*, 782 F.2d at 485; *Petro–Tech*, 824 F.2d at 1356; *Morrow v. Black*, 742 F.Supp. 1199, 1203 (E.D.N.Y.1990); *Blue Line Coal Co. v. Equibank* 1989 WL 63203 at 6 (E.D.Pa. June 12, 1989); *Laterza*, 581 F.Supp. at 413. *Cf. Bank of America Nat. Trust & Sav. Ass'n v. Touche Ross & Co.*, 782 F.2d 966, 970 (11th Cir.1986). Moreover, as the Court has found that Plaintiffs' allegations stating that PMM has aided and abetted mail, wire, and securities fraud are sufficient, the § 1962(c) claim is not dismissible.

leged to have invested any monies derived from the securities scheme. Accordingly, as Plaintiffs have failed to set forth a legal basis for a claim under § 1962(a) against PMM, Count IV is dismissed as to this Defendant.[36]

### C. § 1962(b) Claims against Defendant Bodden

■ Bodden moves to dismiss the § 1962(b) claim asserted against him in *Feld* on the grounds that it fails to assert any facts in support of Plaintiffs' claim that Defendant acquired or maintained control of or an interest in a RICO enterprise through a pattern of racketeering activity.[37] Without elaboration, the Court finds this argument to be without merit as Plaintiffs have clearly set forth in sufficient detail for purposes of a motion to dismiss allegations stating that Bodden's involvement in the predicate acts resulted in the maintaining of control over SAI. In addition, Bodden and Logal contend that Plaintiffs' claims are deficient in that they fail to allege an injury caused by either the use of income derived from racketeering activity or by the acquisition or maintenance of an interest in a RICO enterprise. Unlike the additional causation connection necessary to state a cause of action under § 1962(a), however, § 1962(b) does not require such a nexus. As this court previously stated in *Avirgan v. Hull*, 691 F.Supp. 1357 (S.D.Fla.1988):

> The causation link of § 1962(b) is direct. The plaintiff must be injured by the defendant's pattern of racketeering activity, that was used to either acquire or maintain any interest in or control of, any enterprise. Accordingly, the plaintiff must be injured by the pattern of

racketeering activity committed by the defendant.

*Id.* at 1362. As Plaintiffs have alleged injuries resulting from the alleged racketeering activity, their complaints are sufficient.

### D. § 1962(d) Claims

■ A RICO conspiracy claim has been asserted in all of the actions before the Court against the Management Defendants. In addition, Plaintiffs in *B.F. Enterprises* bring a § 1962(d) claim against the outside director Schaefer and PMM. In order to establish a RICO conspiracy, there must be evidence of an agreement to violate a substantive provision of the statute. *U.S. v. Carter*, 721 F.2d 1514, 1528 (11th Cir.), *cert. denied sub nom. Morris v. U.S.*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984). Proof that the defendant agreed to personally commit two predicate acts is not always necessary, however. Where the evidence demonstrates that a defendant agreed to participate in the conduct of an enterprise's affairs with the knowledge and intent of violating a substantive RICO provision, further proof of the defendant's agreement to personally commit two predicate acts is not required. *Id.* at 1531. Where, on the other hand, the defendant agreed to participate in a conspiracy with a single objective, a plaintiff must establish that the defendant consented to personally commit two or more predicate acts to recover. Without such proof, "the requisite pattern of racketeering necessary to the objective of a RICO conspiracy is lacking," precluding recovery under § 1962(d). *Id.* at 1531. A conspirator need not have full knowledge of every detail regarding the conspiracy; it is sufficient if he knows of the "essential nature of the plan." *U.S. v.*

---

**36.** The Court does note, however, that such investment is not necessary to hold one responsible for a violation of § 1962(d). Under this provision, one may be a conspirator who aids in a § 1962(a) violation even though he did not himself invest any income derived from a pattern of racketeering activity. *See, e.g., Kurz v. Mairone,* 1989 WL 8870 at 8, 1989 U.S.Dist. LEXIS 981 at 22–23 (E.D.Pa. Feb. 3, 1989); *United States v. Loften,* 518 F.Supp. 839, 854 (S.D.N.Y.1981), *aff'd,* 819 F.2d 1130 (2d Cir. 1987).

**37.** Section 1962(b) provides:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

*Kopituk,* 690 F.2d 1289, 1323 (11th Cir. 1982), *cert. denied sub nom. Turner v. U.S.,* 461 U.S. 928, 103 S.Ct. 2089, 2090, 77 L.Ed.2d 300 (1983) (quoting *U.S. v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978)). Moreover, proof of an overt act in furtherance of the conspiracy is not required by § 1962(d). *U.S. v. Teitler,* 802 F.2d 606, 613 (2d Cir.1986). Although Rule 9(b)'s particularity requirement does not apply to RICO conspiracy claims, "[c]onclusory allegations or a 'bare bones' statement of conspiracy" will not survive a motion to dismiss. *O'Malley v. O'Neill,* 887 F.2d 1557, 1560 (11th Cir.1989). It is with these legal principles in mind which the Court now evaluates Defendants' arguments that the RICO conspiracy claims should be dismissed.

■ Although alleging an agreement to violate § 1962(a), (b) or (c) is essential to establishing a conspiracy claim under § 1962(d), proof of such a claim is often established by circumstantial evidence. *Kopituk,* 690 F.2d at 1323. Thus, although Plaintiffs, with the exception of those in *B.F. Enterprises,* do not specifically allege an explicit pact to commit a pattern of racketeering in violation of the substantive provisions of the statute, their allegations, read in their totality, clearly suggest that such an agreement was made. Each complaint details a grand scheme collectively and knowingly carried out by Defendants to overstate the financial condition of SAI and maintain an artificially high market price for the SAI stock, thereby defrauding the investing public. During approximately a four-year period, the defendants allegedly overstated at least $45 million in sales and receivables, disseminated numerous false documents to the public and committed various other wrongful acts in violation of state and federal laws, which constitute predicate acts under RICO. The very essence of the fraud alleged, therefore, implies a group-oriented operation, which indeed could not have been carried out without the consent and participation of a large number of individuals—alleged here to be the various Defendants. Moreover, where, as here, a defendant is alleged to have committed two or more predicate acts "the inference of an agreement to do so is unmistakable." *Carter,* 721 F.2d at 1530 (quoting *Elliott,* 571 F.2d at 903). There is also no question that these allegations adequately set forth the nature and purpose of the conspiracy. Consequently, the Court concludes that Plaintiffs' RICO conspiracy allegations are sufficient, at this juncture at least, to support the claims made.

## IV. STATE LAW CLAIMS

■ Plaintiffs assert numerous claims under various state law theories, all related in some manner to the overall alleged fraudulent scheme. As the Court has determined that the majority of Plaintiffs' federal claims are properly before the Court, the Court concludes that it is appropriate to exercise its pendent jurisdiction over the related state claims in the interest of "judicial economy, convenience and fairness to litigants." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218, 228 (1966).

### A. *Fraud–Related Claims*

In the actions now pending, Plaintiffs assert various fraud claims under the Florida Securities Investors Protection Act (F.S.I.P.A.),[38] Fla.Stat. §§ 517.211 and 517.-

---

38. § 517.301, which creates a criminal or administrative offense for securities fraud, is virtually identical to Rule 10b–5. It provides in pertinent part:

 (1) It is unlawful ... for a person

 (a) In connection with the offer, sale, or purchase of any investment or security ... directly or indirectly:

 1. To employ any device, scheme, or artifice to defraud;

 2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

 3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

 Section 517.211(2), which operates upon § 517.301 provides:

 Remedies available in cases of unlawful sale.—

301 (1988), common law fraud and misrepresentation. The allegations generally state that the defendants intentionally or negligently made misrepresentations or omissions of material fact on which Plaintiffs relied to their detriment. To establish a claim for statutory or common law fraud in Florida, a plaintiff must prove (1) a misrepresentation or omission (2) of information material to the securities transaction (3) made with scienter (4) upon which the plaintiff reasonably relied (5) that proximately caused his injury. *Gochnauer*, 810 F.2d at 1046; *Alna Capital Associates v. Wagner*, 758 F.2d 562, 566 (11th Cir.1985). Defendants, in moving to dismiss these Counts, contend that Plaintiffs have failed to adequately set forth reliance and scienter.

■■■■ As is the case under the federal security laws, a plaintiff alleging statutory or common law fraud in Florida must plead that he reasonably relied upon the misrepresentation or omission. *Milos*, 717 F.Supp. at 1524. Unlike under federal law, however, a presumption of reliance based on a "fraud on the market theory" is unavailable in Florida. *Kahler v. E.F. Hutton & Co.*, 558 So.2d 144, 145 (Fla. 3d Dist.Ct.App.1990) (finding that jurisdiction for fraud on the market-type claims "lies exclusively in the United States District Court"). *See also Keyser v. Commonwealth Nat. Financial Corp.*, 121 F.R.D. 642, 649 (M.D.Pa.1988) (fraud on the market claim unavailable in common law); *Snider v. Upjohn Co.*, 115 F.R.D. 536, 542 (E.D.Pa.1987) ("Fraud on the market theories of reliance have not been developed in state courts"). Plaintiffs in *Feld* and *Adler* have not stated which of them read and relied on which particular statements made by Defendants. Accordingly, as discussed above, they have failed to adequately plead actual reliance. Since they are not entitled to a presumption of reliance, their claims for common law and statutory fraud must be dismissed. The fraud-related claims asserted in *B.F. Enterprises, ILP, Revere* and *Franklin*, on the other hand, will not be dismissed on this basis.

■■ Nor are Defendants in *B.F. Enterprises, ILP, Revere* and *Franklin* entitled to dismissal of the state law fraud claims against them on the grounds that Plaintiffs have set forth inadequate allegations of scienter. Stating a cause of action under the F.S.I.P.A. or Florida common law fraud is virtually identical to stating a claim under Rule 10b–5 "except that the scienter requirement under Florida law is satisfied by a showing of mere negligence, whereas the minimum showing under Rule 10b–5 is reckless disregard." *Gochnauer*, 810 F.2d at 1046. *See also Alna Capital*, 758 F.2d at 566; *Milos*, 717 F.Supp. at 1524; *Zelman v. Cook*, 616 F.Supp. 1121, 1128 (S.D.Fla.1985). As the Court has determined that Plaintiffs have adequately pled scienter under the more stringent federal standard, it similarly concludes that Plaintiffs have met their pleading burden under Florida law.

■■ As a final argument in favor of dismissing the F.S.I.P.A. claims, Defendants contend that Plaintiffs fail to assert buyer/seller privity. In support of their position that buyer/seller privity is required, they cite *E.F. Hutton & Co. v. Rousseff*, 537 So.2d 978 (Fla.1989), where the Florida Supreme Court stated in dicta that relief under § 517.211 requires proof of privity. Contrasting the express civil liability provision of § 517.211 with the implied liability of Rule 10b–5, the court explained:

> Rule 10b–5 is wide-ranging, covering a broad spectrum of fraud. It applies to *any* person who is deceitful *in connection with* the purchase or sale of securities. It requires no privity between buy-

(2) Any person purchasing or selling a security in violation of s. 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.

er and seller.... [S]ection 517.211 ... [on the other hand] applies to a far more narrow group of activities than does rule 10b–5. *Buyer/seller privity is required.*

*Id.* at 981 (emphasis added).

Section 517.211(2) provides a civil cause of action for Plaintiffs, as buyers of securities, against "[a]ny person ... selling a security in violation of § 517.301 and every director, officer, partner, or agent of or for the ... seller, if the director, officer, partner, or agent has personally participated or aided in making the sale." Fla.Stat. § 517.-211(2).[39] Thus, by the express language of the statute itself, it is clear that an officer, director or agent not otherwise in strict contractual privity with the plaintiff-purchaser may be found liable for fraudulent conduct under § 517.301. To read the Florida Supreme Court's statement that "[b]uyer/seller privity is required" in the strict sense which Defendants urge would expressly contravene the explicit statutory language and legislative intent of the provision. Accordingly, this Court holds that a plaintiff may recover under § 517.211 from either (1) his seller, who he is in privity with, as well as (2) any officer, director, partner or agent of such a seller who has solicited the sale of the securities on his own behalf or on behalf of the seller.[40]

Plaintiffs in *Feld, Adler, Revere,* and *Franklin* fail to allege from whom they bought the SAI securities. Had they bought them from SAI, it would be a question of fact whether any of the officers and directors of SAI or whether PMM, as an agent of SAI, had sufficient participation in the sales to hold it liable under § 517.211. As they omit to state that SAI was the seller, those counts premised on §§ 517.301 and 517.211 are dismissed. Plaintiffs in *B.F. Enterprises* and *ILP,* on the other hand, do specify that they bought the securities from SAI or McKinley Allsopp (the broker-dealer). In addition, they state that the various defendants were officers, directors and/or agents [41] of SAI who carried out several acts in violation of § 517.301 which induced Plaintiffs to purchase. Whether Defendants in fact solicited the sale of the securities and, therefore, are liable under §§ 517.301 and 517.211, is a question of fact to be determined at trial or earlier summary proceedings. Accordingly, Defendants' motions to dismiss the F.S.I.P.A. claims in *B.F. Enterprises* and *ILP* are

---

**39.** Defendant Bodden urges the Court to dismiss the state law fraud and misrepresentation claims, arguing that the state law claims improperly predominate and that there is a potential for jury confusion due the different standards applicable under state law and federal Rule 10b–5. The Court cannot agree. To begin with, unlike those cases cited by Bodden where courts have declined to exercise their pendent jurisdiction, the state law claims do not predominate here. Moreover, the Court perceives no undue complexity in trying the state and federal claims together. As stated by one judge: "[I]t has never ceased to amaze this Court at the common sense and understanding of the lay jury ... It is a wisdom which should not be dismissed lightly ... [N]ot only is the right to trial by jury sacrosanct, but so is the deference to a jury's ability to sift through the issues of fact and law...." *Linsey v. E.F. Hutton & Co.,* 704 F.Supp. 220, 222 (S.D.Fla.1989). *See also Olsen v. Paine Webber, Jackson & Curtis, Inc.,* 623 F.Supp. 17, 18 (M.D.Fla.1985). *But see Eddy v. City of Miami,* 715 F.Supp. 1553, 1557–58 (S.D.Fla.1989); *Stowell v. Ted S. Finkel Inv. Serv., Inc.,* 489 F.Supp. 1209, 1217–18 (S.D.Fla.

1980), *aff'd on other grounds,* 641 F.2d 323 (5th Cir.1981).

**40.** One can be liable as a "seller" or an "agent" of the seller under Florida law if he in some way solicits the sale of securities. *See Beltram,* 725 F.Supp. at 500; *Artistic Door Corp. v. Rheney,* 384 So.2d 179, 182 (Fla. 3d Dist.Ct.App. 1980); *Ruden v. Medalie,* 294 So.2d 403, 406 (Fla.3d Dist.Ct.App.1974). Although no case to this Court's knowledge has specifically addressed the issue, this Court determines that conduct sufficient to constitute solicitation for the purposes of satisfying § 517.211 liability is similar to that deemed sufficient by the Supreme Court in *Pinter v. Dahl* to hold one liable as a "seller" under § 12(2) of the Securities Act of 1933. *Cf. Beltram,* 725 F.Supp. at 500 (mentioning *Pinter's* standard for liability and then finding that no showing was made in the case before it that defendant solicited the sale of securities under § 517.211).

**41.** Although PMM is not explicitly alleged to be SAI's agent for the purpose of selling the securities, this Court concludes that the allegations provide a sufficient basis to imply that such may have been the case.

denied.[42]

### B. *Negligence Claims Against PMM*

■ All Plaintiffs have alleged a claim against PMM based on negligence, gross negligence and/or negligent misrepresentation, asserting that PMM negligently prepared financial statements and that Plaintiffs relied on those statements to their detriment. PMM moves to dismiss, in all cases other than *ILP*, on the grounds that Plaintiffs have not stated a claim for negligence because they have failed to assert that PMM was aware that Plaintiffs would rely on its audits at the time the audits were conducted.[43] Up until recently, the law in Florida was that an accountant was not liable to known third parties for negligence in the absence of privity of contract. *See, e.g., Gordon v. Etue, Wardlaw & Co., P.A.*, 511 So.2d 384, 389 (Fla. 1st Dist.Ct. App.1987); *Investors Tax Sheltered Real Estate, Ltd. v. Laventhol, Krekstein, Horwath & Horwath*, 370 So.2d 815, 817 (Fla. 3d Dist.Ct.App.1979), *cert. denied*, 381 So.2d 767 (Fla.1980). However, the Florida Supreme Court recently has held that a third party not in privity with an accountant may nevertheless state a claim for negligence in certain limited circumstances. *First Florida Bank, N.A. v. Max Mitchell & Co.*, 558 So.2d 9 (Fla.1990). In *Max Mitchell*, an accountant whose firm had prepared audited financial statements of C.M. Systems negotiated the loan on behalf of his client and personally delivered the statements to the plaintiff bank with knowledge that the bank would rely on them in considering whether to make his client a loan. However, at the time the

audits were prepared, the accountant was unaware that the particular bank would rely on them. Subsequently, it was discovered that the audit for one of the fiscal years had substantially overstated assets and net income and understated the liabilities of C.M. Systems. Evaluating several approaches entertained by other courts, the court in *Max Mitchell* refused to limit accountant liability only to situations where there is privity, stating that "[b]ecause of the heavy reliance upon audited financial statements in the contemporary financial world, we believe permitting recovery only from those in privity or near privity is unduly restrictive." *Id.* at 15. However, the court refused to go so far as to permit recovery for all persons whom an accountant should have reasonably foreseen would rely upon its work. Rather, the court adopted the middle-ground approach of § 552 of the *Restatement (Second) of Torts* (1976), which states that an accountant may be liable not only to those with whom it is privity or near privity, but also "to those persons or classes of persons whom [it] 'knows' will rely on his opinion, rather than those [it] should have known would do so." *Id.* at 15. Applying this test to the facts before it, the court concluded the accountant was liable to the bank for having negligently prepared the audit. Although not knowing the plaintiff would rely on its audit at the time it was prepared, the accountant took affirmative steps subsequently to encourage the bank to act in reliance thereon. *Id.* at 16.

■ Here, there is no dispute that Plaintiffs are not in contractual privity

---

42. Defendants Bodden and Schaefer also move to dismiss Count IX of the *B.F. Enterprises* Complaint to the extent that it states a claim under § 352–c of the New York General Business Law. The law is clear that there is no private cause of action under the New York provision. *Apex Oil Co. v. DiMauro*, 713 F.Supp. 587, 607–08 (S.D.N.Y.1989); *Feinman v. Schulman Berlin & Davis*, 677 F.Supp. 168, 173 (S.D.N.Y.1988); *CPC Intern., Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 519 N.Y.S.2d 804, 806, 514 N.E.2d 116, 118 (1987). Therefore, Defendants' motions are granted.

43. Plaintiffs also assert that they may sue PMM under a theory of negligence as they are third-

party beneficiaries to the contracts of engagement between PMM and SAI. They are plainly mistaken. Florida courts have held that stockholders of a corporation are not third-party beneficiaries of a contract between the corporation and its auditors and, thus, may not maintain a suit for breach of contract. *Mulligan v. Wallace*, 349 So.2d 745, 746–47 (Fla. 3d Dist.Ct.App.) (per curiam), *cert. denied*, 354 So.2d 983 (Fla. 1977); *Dubbin v. Touche Ross & Co.*, 324 So.2d 128, 129 (Fla. 3d Dist.Ct.App.1975) (per curiam), *cert. denied*, 336 So.2d 1181 (Fla.1976). Accordingly, it follows that stockholders are not entitled to maintain a cause of action for the negligent performance of that contract.

with PMM. Moreover, Plaintiffs do not maintain that PMM took affirmative steps to induce their reliance on its audits of SAI, opinions on SAI's audited-financial statements and reports issued following its reviews of SAI's interim unaudited financial statements during fiscal years 1986 through 1988. Thus, the Court must inquire as to whether PMM knew *at the time* it issued its audits and opinions that the various plaintiffs would rely upon them. Considering the class action plaintiffs in *Feld* and the plaintiffs in *Adler*—all who purchased on the open market—the Court concludes that they may not maintain this cause of action against PMM. They are among that group of persons which PMM should have foreseen might rely on its work product, yet PMM did not perform knowing and intending that the plaintiffs would rely on the information in deciding to purchase the SAI common stock. *See id.*

■ The institutional investors, however, stand in a different position. At the time PMM performed some of its audits and issued its opinions and reports, Plaintiffs allege that the accounting firm was aware that these specific plaintiffs would act in reliance thereon. In *Franklin*, for example, Plaintiff contends that PMM was familiar with the contents of a Purchase Agreement dated February 27, 1987, which reflected Plaintiff's purchase of $625,000 in notes from SAI, when it issued its February 27, 1987 and March 31, 1987 letters to McKinley Allsopp, the company engaged by SAI to privately place its debentures and warrants. According to the allegations, the letters written by PMM to McKinley Allsopp referred to the financial statements it had previously prepared and expressed an understanding that reference could be made to the letters in the agreements relating to the offer, sale and purchase of the securities to be issued in the private placement. Consequently, taking the allegations as true, PMM knew of a specific group of persons who intended to rely on its representations.

Similarly, in *Revere*, Plaintiff alleges that the Note Agreement dated February 12, 1987 between it and SAI provided that PMM or some other independent outside accountant would certify the audits conducted on SAI's financial statement at the end of each fiscal year and that the accountant would certify that it read the Agreement and a copy of the Note and would consider them in their evaluation. The Revere Fund made its first purchase of a SAI note on February 12, 1987. As there is no indication that at the time the audits relied on by Plaintiff in this transaction were conducted with knowledge that the transaction would take place, Plaintiff has no cause of action for any negligence by PMM in preparing these audits. On the other hand, the Court concludes that Plaintiffs adequately allege that the subsequent audits conducted by PMM were made with the knowledge that Plaintiff would be acting in reliance thereon. Thus, the PMM may be held liable for these later audits should Plaintiff prevail on its negligence claim.

Finally, as to *B.F. Enterprises*, Plaintiffs allege that SAI's Form 10Q filed with the SEC contained a representation that PMM was aware that SAI planned a 1987 Private Placement and that PMM took affirmative steps to assist with the offering by answering investor inquiries about SAI's financial condition. Likewise, Plaintiffs contend that PMM took active steps to assure the success of the Bridge Financing in that it directly told representatives from Gateway Advisors, Inc., the company which partially arranged the Bridge Financing, that SAI's accounting policy was acceptable as well as confirmed the amount of work in progress reported by SAI. The allegations of negligence concerning the 1987 Private Placement and the Bridge Financing are therefore sufficient. However, as to the 1988 Exchange Offer, there is no indication that PMM knew at the time it conducted audits of SAI's financial statements and issued opinions and reports on the financial condition of SAI that the Exchange would occur, nor is there any indication that PMM took any affirmative actions to facilitate the Exchange. Accordingly, PMM cannot be held liable under Florida common law for any negligent conduct which may have oc-

curred in reference to the information it disseminated which Plaintiffs may have relied upon in participating in the 1988 Exchange Offer.

### C. *Conspiracy*

 Plaintiffs in *B.F. Enterprises* assert a common law conspiracy claim against all Defendants. In order to state a cause of action for conspiracy in Florida, a plaintiff must allege: (1) an agreement between two or more people to achieve an illegal objective, (2) an overt act in furtherance of the conspiracy, and (3) injury. *Armbrister v. Roland Intern. Corp.*, 667 F.Supp. 802, 809 (M.D.Fla.1987). Having determined that the allegations in support of Plaintiffs' claim for a RICO conspiracy are ample and further, finding that several overt acts committed to foster the alleged conspiracy have been set forth, the Court declines to dismiss this state law claim.

### D. *Punitive Damages*

 Defendants Bodden and Logal move to strike Plaintiffs' demand for punitive damages in Count IV of the *Feld* Consolidated Amended Class Action Complaint, arguing that Plaintiffs have not complied with Florida Statute § 768.72, which requires there to be evidence in the record or proffered by Plaintiffs establishing a reasonable basis for such damages before a claim for punitive damages may be asserted. Defendants are mistaken that § 768.72 applies to this case, however.

This Court has recently held in *State of Wisconsin Investment Board v. Plantation Square Associates, Ltd.*, 761 F.Supp. 1569 (S.D.Fla.1991), that the Supreme Court's analysis in *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), compels the conclusion that the pleading of punitive damages in an action filed in federal court is governed by the provisions of Federal Rule of Civil Procedure 8(a), which requires only "a short and plain statement of the claim showing that [the plaintiff] is entitled to relief," and not by Fla.Stat. § 768.72, which irreconcilably conflicts with the notice pleading requirement of Rule 8(a). Accordingly, the motions to strike the punitive damage claims under § 768.72 are denied. *Id.* at 1574.

### CONCLUSION

For the foregoing reasons, the Court hereby ORDERS AND ADJUDGES as follows:

1. As to the *Feld* Consolidated Amended Class Action Complaint, Count III, to the extent that it seeks relief for aiding and abetting a violation under § 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, Count IV, Count V, Count VI to the extent that it names PMM as a defendant, and Count VII are DISMISSED without prejudice.

2. As to the *Adler* Complaint, Count I, Count V, Count VI and Count VIII are DISMISSED without prejudice.

3. As to the *Revere* Complaint, Count III to the extent that it seeks relief for aiding and abetting a violation under § 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, Count V, Count VI, to the extent it seeks relief from PMM for negligence in reference to those audits relied upon by Plaintiff in the February 12, 1987 purchase of the SAI note, and Count VII are DISMISSED without prejudice.

4. As to the *B.F. Enterprises* First Amended Complaint, Counts II and IV, to the extent that they name PMM as a defendant, Count VIII, to the extent it seeks recovery for PMM's alleged negligence in reference to the documents allegedly relied upon by Plaintiffs in the 1988 Exchange Offer, and Count IX, to the extent it seeks recovery for a violation of § 352–c of the New York General Business Law, are DISMISSED without prejudice.

5. As to the *Franklin* Complaint, Count III, to the extent that it seeks relief for aiding and abetting a violation under § 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, and Count VII are DISMISSED without prejudice.

6. All other motions to dismiss are hereby DENIED.

7. As the RICO claims have been adequately pled, the Court declines to require a RICO standing order as requested by Defendant Logal.

8. Plaintiffs have thirty (30) days from the date of this Order to amend their complaints should they choose to do so.

9. Where Plaintiffs choose to amend any particular complaint, Defendants shall have twenty (20) days from the filing of such amendment to answer the particular complaint or file any other responsive pleading. Where Plaintiffs do not wish to amend, however, Defendants shall answer within fifty (50) days from the date of this Order.

DONE AND ORDERED.