IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

J.P. MORGAN SECURITIES, LLC, MADHUKAR NAMBURI
and ESTEBAN SCHRECK,

      Appellants,

 v.                                      **Case No. 5D15-4272**

GEVERAN INVESTMENTS LIMITED, LIGHTING SCIENCE
GROUP CORPORATION, PEGASUS CAPITAL ADVISORS, L.P.,
PEGASUS CAPITAL, LLC, PEGASUS CAPITAL ADVISORS GP,
LLC, PCA LSG HOLDINGS, LLC, et al.,

      Appellees.
_____/

Opinion filed August 4, 2017

Appeal from the Circuit Court for
Orange County,
Alice Blackwell, Judge.

Mayanne Downs and Rachael M. Crews, of Gray
Robinson, P.A., Orlando, and Adam Balin, James I.
McClammy, Amelia T.R. Starr and Christopher
Ratcliffe Le Coney, of Davis Polk & Wardwell, LLP,
New York, NY, for Appellants, J.P. Morgan, et al.[1]

Thomas A. Zehnder and David B. King, of King,
Blackwell, Zehnder & Wermuth, P.A., Orlando,
and Bruce S. Rogow and Tara A. Campion,

---

[1] Cases 5D15-4272 and 5D15-4273, traveling together on appeal, were consolidated for oral argument and for purposes of this opinion. In case 5D15-4272, J.P. Morgan, et al., appeal from the denial of a motion to dismiss as well as summary final judgment in favor of Geveran Investments Limited. In case 5D15-4273, Lighting Science Group Corp., et al., also appeal from the summary final judgment entered in Geveran's favor. Because J.P. Morgan initiated the appeal in case 5D15-4272 and did not join in the appeal in case 5D15-4273, J.P. Morgan is an Appellant in case 5D15-4272 and an Appellee in case 5D15-4273 pursuant to Florida Rule of Appellate Procedure 9.020(g)(2).

of Bruce S. Rogow, PA, Fort Lauderdale,
for Appellee, Geveran Investments Limited.

Barry Richard of Greenberg Traurig, P.A.,
Tallahassee, Alan T. Dimond, David A. Coulson
and Ian M. Ross, of Greenberg Traurig, P.A., Miami,
for Appellee, Lighting Science Group Corporation.[2]

Daniel S. Newman, P.A., of Broad and Cassel,
Miami, Counsel for Amicus Curiae The Florida
Securities Dealers Association, Inc.

Nicholas A. Shannin, of The Shannin Law Firm,
Orlando, and Jonathan K. Youngwood, Kavitha
S. Sivashanker and Stephen A. O'Connor, of
Simpson Thacher & Bartlett LLP, New York, NY,
Attorneys for Amicus Curiae Securities Industry
and Financial Markets Association.

No Appearance for other Appellees.

And

LIGHTING SCIENCE GROUP CORP., RICHARD WEINBERG,
GREGORY KAISER AND PEGASUS CAPITAL ADVISORS, L.P.

   Appellants,

v.             **Case No.  5D15-4273**

GEVERAN INVESTMENTS LIMITED, J.P. MORGAN
SECURITIES, LLC, PEGASUS CAPITAL ADVISORS, L.P.,
PEGASUS CAPITAL, LLC, PEGASUS CAPITAL
ADVISORS, GP, LLC, PCA LSG HOLDINGS, LLC, et al.,

   Appellees.
_____/

Opinion filed August 4, 2017

----

[2] Likewise, because Lighting Science Group Corp., Pegasus Capital Advisors, Richard Weinberg, and Gregory Kaiser did not join J.P. Morgan, et al., in case 5D15-4272, and instead appealed the summary final judgment in case 5D15-4273, these parties are Appellants for purposes of case 5D15-4273 and Appellees for purposes of case 5D15-4272, pursuant to Florida Rule of Appellate Procedure 9.020(g)(2).

Appeal from the Circuit Court for
Orange County,
Alice Blackwell, Judge.

Barry Richard of Greenberg Traurig, P.A.,
Tallahassee, Alan T. Dimond, David A.
Coulson and Ian M. Ross, of Greenberg
Traurig, P.A., Miami, and, for Appellants,
Lighting Science Group Corporation, et al.

Bruce S. Rogow and Tara A. Campion of
Bruce S. Rogow, P.A., Ft. Lauderdale,
Thomas A. Zehnder and David B. King,
of King, Blackwell, Zehnder & Wermuth,
P.A., Orlando, for Appellee, Geveran
Investments Limited.

Nicholas A. Shannin, of The Shannin Law
Firm, Orlando, Jonathan K. Youngwood,
Kavitha S. Sivashanker and Stephen A.
O'Connor, of Simpson Thacher & Bartlett
LLP, New York, NY, Attorneys for Amicus
Curiae Securities Industry and Financial
Markets Association.

Daniel S. Newman, P.A., of Broad and
Cassel, Miami, Counsel for Amicus Curiae
The Florida Securities Dealers Association,
Inc.

No Appearance for other Appellees.

COHEN, C.J.

## ON MOTION FOR REHEARING

Upon considering Appellee Geveran Investments' motion for clarification and correction pursuant to Florida Rule of Appellate Procedure 9.330, we grant the motion, recall our earlier opinion issued June 9, 2017, and substitute this opinion in its place.

3

Lighting Science Group Corp., et al.[3] ("LSG") and J.P. Morgan Securities, LLC, Madhukar Namburi, and Esteban Schreck[4] ("J.P. Morgan") (collectively, "defendants") appeal the trial court's entry of summary final judgment in favor of Geveran Investments Limited ("Geveran"). The parties stipulated to final judgment and the dismissal of their additional claims and affirmative defenses for the purposes of appealing the trial court's entry of partial summary judgment on Geveran's claim under the Florida Securities and Investor Protection Act ("FSIPA"), sections 517.011–32, Florida Statutes (2012). The final judgment awarded Geveran $25 million in rescissory damages under section 517.221(3)(a), Florida Statutes (2012), along with $6,752,280 in prejudgment interest; $4,456,787.40 in attorneys' fees; and $469,061.93 in costs: a total recovery of $36,678,129.33, for which the defendants are jointly and severally liable.

The defendants argue that the trial court erred in entering summary judgment in Geveran's favor because genuine issues of material fact exist as to Geveran's entitlement to relief. We agree and reverse and remand this case for further proceedings. We also find that the court erred in denying J.P. Morgan's motion to dismiss Geveran's claims against Namburi and Schreck because the complaint failed to allege facts sufficient to establish that they acted as agents of the seller, LSG. Therefore, on remand the trial court is directed to dismiss LSG's claims against Namburi and Schreck.

---

[3] The other Appellants in case 5D15-4273 are Pegasus Capital Advisors, LP, which owns a controlling stake in LSG, Richard Weinberg, LSG's CEO and a senior partner at Pegasus, and Gregory Kaiser, LSG's CFO.

[4] Namburi and Schreck are employees of J.P. Morgan's investment banking group. Namburi is the executive director of the group, and Schreck is the vice president. Both Namburi and Schreck were involved in assisting LSG in soliciting Geveran's investment.

LSG is a Delaware corporation with executive offices in Satellite Beach, Florida, and is controlled by Pegasus Capital Advisors, L.P., a U.S.-based private equity fund. LSG originally focused on selling high-end, made-to-order lighting, but in 2010, LSG shifted its business model to designing, manufacturing, and marketing light-emitting diode ("LED") light products, including replacement bulbs and fixtures, for retail and commercial customers.[5] Geveran is an international investment company, one of several companies within the Fredriksen Group, organized under the laws of Cyprus. Geveran employed Fredrick Halvorsen, a Norwegian businessman and investor, to identify investment opportunities on its behalf.[6]

Halvorsen anticipated a "massive shift towards LED lighting" and sought out investment opportunities within the green-energy industry for Geveran. Halvorsen specifically sought "pre-IPO" investments—companies that were not publicly traded on major stock exchanges but that were planning on becoming publicly traded in the near future.[7]

---

[5] Because we are reviewing an order granting summary judgment, we present the facts in the light most favorable to the nonmoving party, the defendants, and draw all reasonable inferences in the nonmoving party's favor. See Martins v. PNC Bank, Nat'l Ass'n, 170 So. 3d 932, 935 (Fla. 5th DCA 2015).

[6] Halvorsen had previously been the CEO and CFO of a Norwegian technology company valued in the billions.

[7] Technically, LSG was a "re-IPO" in that it already offered a small volume of shares to the public on the "over-the-counter" ("OTC") market. LSG's S-1/A noted that the value of these shares had been low and trading of them thin because Pegasus controls LSG and minority shareholders would have little control over LSG. Given how thinly traded LSG's stock is, we have placed no significance on the fluctuations of the stock's price over the course of the events giving rise to this dispute.

Prior to Geveran's investment, J.P. Morgan agreed to work as a placement agent and underwriter for LSG. Under the terms of the agreement, J.P. Morgan agreed to "assist the Company [LSG] in soliciting and receiving an offer from the Purchasers to purchase Securities."[8] At Halvorsen's request, J.P. Morgan communicated Geveran's interest in investing in LSG.

Halvorsen met with representatives of LSG, including LSG's director Richard Weinberg and CFO Gregory Kaiser, along with representatives from J.P. Morgan, including Namburi and Schreck, and representatives of Pegasus in Florida on April 4, 2011, to discuss a possible investment. Halvorsen sat through multiple presentations, including presentations by Weinberg and Namburi, about LSG's finances. Halvorsen also heard a presentation about LSG's initiatives to improve its gross profit margin.[9] Halvorsen reviewed various financial projections and LSG's 2010 form 10-K,[10] which was filed with the SEC on April 1, 2011.

---

[8] The agreement entitled J.P. Morgan to rely on LSG's company information without independent verification and provided for indemnification by LSG for any liability. The agreement also specified that LSG's past financial data were prepared in accordance with generally accepted accounting principles ("GAAP").

[9] An expert for Geveran explained that gross profit is determined by subtracting the cost of goods sold—all of the direct costs associated with producing the products— from total revenue. When gross profits are divided by revenue and multiplied by 100%, the resulting percentage, referred to as "gross margin," provides an estimate of the profits on each unit sold. Companies with high gross margins will become even more profitable as revenues grow while companies with low gross margins will continue to generate low profits even as their business expands.

[10] The form 10-K is an annual report that provides a "comprehensive overview of the company's business and financial condition and includes audited financial statements." SEC, Form 10-K, (June 26, 2009), https://www.sec.gov/answers/form10k.htm.

Halvorsen prepared his own analysis of LSG in an email dated April 28, 2011. He noted that LSG had a planned IPO within the next twelve months and was on pace to begin earning money in July and to have positive cash flow by December. He also noted a general shift toward LED lighting and LSG's recent distribution agreement with Home Depot, which would expand LSG's retail sales. He noted, however, that the investment was contingent on LSG shifting its manufacturing base from the United States to Mexico and that the IPO required LSG to continue to improve its earnings.

Geveran relied on Halvorsen's expertise and presentations from LSG and J.P. Morgan for its due diligence review. Geveran ultimately agreed to purchase 6,250,000 shares of LSG at $4 per share: a total investment of $25 million. The agreement certified that the 2010 form 10-K provided to Halvorsen complied with all relevant laws and that the financial statements included therein complied with generally accepted accounting principles ("GAAP"). Halvorsen signed the subscription agreement with LSG on behalf of Geveran on May 10, 2011.[11]

Prior to signing the agreement, LSG had filed a form S-1/A with the SEC in anticipation of making a re-IPO in the summer of 2011. In response, the SEC sent LSG a fax on April 28, 2011, raising several concerns with LSG's S-1/A, including concerns with note five of its financial statements regarding inventories. In note five, LSG explained that because it was in an early stage of development, it classified its obsolete, unsold inventory as "research and development" rather than a cost of manufacturing—a "cost of

---

[11] The agreement was a "Regulation S" offering, meaning that the securities offered did not have to be registered under section 5 of the Securities Act of 1933 because they were offered outside of the United States. See Lighting Sci. Grp. Corp., Current Report (Form 8-K) (May 10, 2011) (announcing Regulation S subscription agreement).

goods sold." The SEC's letter noted the SEC's view, expressed in ASC section 420-10-S99-3, that these costs should be included in cost of goods sold.[12] A copy of the SEC's letter was emailed to Namburi and Schreck, among many others, moments after it was received. Halvorsen, however, was not provided the letter.[13] On May 3, the SEC sent a similar letter to LSG, this time taking issue with LSG's 2010 form 10-K—the same form 10-K referenced in the subscription agreement signed a week later and provided to Halvorsen. The second letter raised the same concerns as the previous letter, and Namburi and Schreck were again sent a copy of the letter soon after it was received.

The day before the subscription agreement was signed, Namburi forwarded Halvorsen an email that he had received from Kaiser containing information about LSG's April sales. Namburi had deleted the section of the email showing disappointing gross margins for LSG. Namburi later claimed that he deleted the numbers because he was unsure of their accuracy. In a separate email, Namburi expressed frustration to Kaiser that the April gross margins were around 3–6% when they had informed Halvorsen the margins would be around 9%.

---

[12] Accounting Standard Codification, § 420-10-S99-3, available at https://asc.fasb.org/section&trid=2558983#d3e141019-122747 (login required).

[13] Namburi testified that he was "pretty confident" he had a conversation with Halvorsen about the SEC comments and LSG's compliance with GAAP, although he did not know the date. He also noted that the SEC's approval was key to the timing of LSG's re-IPO, which was an important milestone for the company, although he declined to offer an opinion about the materiality of the restatement.

Namburi also sent an email days before the subscription agreement was signed that referenced the SEC comment letters and stated that the comments would need to be disclosed to "our investors" even though the restatement was not material. The email was part of a chain related to soliciting additional investors for LSG, not including Geveran.

8

On May 12, after the subscription agreement had been signed, LSG responded to the SEC letters by explaining that its policy in 2008 and 2009 had been to purchase raw materials and supplies for research and development but to classify those materials as "obsolete" along with any unsold inventory—meaning LSG did not distinguish between materials actually used for research and development and unsold product. LSG initially claimed that only $2 million in 2009 and $445,000 in 2008 needed to be reclassified from research and development to cost of goods sold. Days later, LSG sent an additional letter to the SEC providing a materiality analysis based on Staff Accounting Bulletin 99.[14] The analysis concluded that the misstatements were not material because they had no impact on "any trends related to revenue, earnings, or EBITDA [earnings before interest, tax, depreciation, and amortization]" and would not have affected investors because LSG's business and revenue had significantly shifted since 2008 and 2009. LSG's accountant, McGladrey and Pullen, LLP, ("McGladrey") agreed with this determination and prepared a similar SAB 99 analysis. McGladrey had identified the accounting problem in 2009 and conducted a SAB 99 analysis that likewise concluded that no restatement was necessary.

The SEC responded on June 2 by asking for additional information and a more detailed explanation of how LSG decided to classify certain expenses as research and development or cost of goods sold and how LSG valued its obsolete goods. LSG was not able to provide data to justify its more limited restatement, leading the SEC to request that all of the amount of obsolete goods be reclassified as cost of goods sold. On June

---

[14] The bulletin provides "guidance in applying materiality thresholds to the preparation of financial statements." SEC Staff Accounting Bulletin: No. 99, 64 Fed. Reg. 45150 (Aug. 19, 1999). The bulletin instructs accountants to consider a variety of context-specific quantitative and qualitative factors in determining materiality.

16, LSG filed a form 8-K,[15] indicating that the 2008 and 2009 financial statements would need to be restated and included in the amended 2010 form 10-K. An amended form 10-K for 2010 soon followed. The results of the restatement were:

|  | Originally Reported Gross Profits ($) Originally Reported Gross Margins (%) | Restated Gross Profits ($) Restated Gross Margins (%) |
|---|---|---|
| **2008** | $ 4,069,993 19.6% | $ (448,110)[16] (2.2)% |
| **2009** | $ 6,621,977 21.1% | $ 2,495,867 8.0 % |

The defendants maintain that the restatement only occurred to facilitate faster approval of LSG's form S-1/A and that the restatement was never material. The re-IPO was eventually put on hold and still has not occurred.

There is no record of Halvorsen's reaction to the restatement disclosed in the form 8-K, and he did not discuss the 2008 and 2009 gross margins with anyone from LSG or J.P. Morgan. The record does show that Halvorsen expressed continued confidence and optimism about Geveran's investment until LSG began to seek capital financing from other investors. LSG sold preferred stock to other investors, effectively diluting the value of Geveran's shares. Halvorsen unsuccessfully attempted to obtain better terms for Geveran's investment. These lawsuits followed approximately one year after the restatement.

Namburi, Schreck, and Pegasus each filed a motion to dismiss, but the trial court denied the motions. All parties later moved for summary judgment. The court granted

---

[15] Form 8-K is used to report material events that shareholders should be aware of—the SEC refers to this as "current reports." SEC, Fast Answer: Form 8-K, (Aug. 10, 2012), https://www.sec.gov/answers/form8k.htm.

[16] Parentheses indicate negative values.

partial summary judgment on Geveran's claim for violations of the FSIPA. The parties stipulated to dismissing their additional claims and to the entry of final judgment for the purposes of this appeal.

This Court reviews orders on motions for summary judgment de novo. Volusia Cty. v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 130 (Fla. 2000). Summary judgment must be granted where the summary-judgment evidence shows the absence of any "genuine issue as to any material fact" and an entitlement to judgment as a matter of law. Fla. R. Civ. P. 1.510(c). The moving party has the burden of establishing the absence of any genuine issue of material fact, and all reasonable inferences are drawn in favor of the nonmoving party. Martins, 170 So. 3d at 935.

The FSIPA makes it unlawful to, "in connection with the offer, sale, or purchase of any investment or security, . . . obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, . . . not misleading." § 517.301, Fla. Stat. (2012). The FSIPA provides for a remedy of rescission for all violations of section 517.301 "if the plaintiff still owns the security." Id. § 517.211. Joint and several liability under section 517.301 extends to any "director, officer, partner, or agent [of the seller who] has personally participated or aided in making the sale or purchase." Id.

In E.F. Hutton & Co. v. Rousseff, 537 So. 2d 978, 979 (Fla. 1989), the Florida Supreme Court analogized claims under section 517.211(3) seeking rescission to claims under section 12 of the Securities Act of 1933, which is codified at 15 U.S.C. § 77(*l*) (2016), as well as common law claims for rescission. Section 517.211(2) limits liability to persons involved directly in the sale of the security and damages are limited to the

11

consideration paid. 537 So. 2d at 981. A claim for rescission under section 517.211 includes: 1) a misrepresentation or omission, 2) of a material fact, 3) on which the buyer relied.[17] See Kashner Davidson Sec. Corp. v. Desrosiers, 689 So. 2d 1106, 1107 (Fla. 2d DCA 1997) (citing Rousseff, 537 So. 2d at 981).

The defendants argue that there are genuine issues of material fact as to all three elements of Geveran's claim. We focus on the second and third elements—materiality and reliance—and find there are genuine issues as to both.[18] Although few Florida courts have addressed the issue, the majority of federal courts interpreting section 517.301 have adopted the test for materiality developed by the United States Supreme Court for rule 10b-5 claims.[19] See, e.g., Grippo v. Perazzo, 357 F.3d 1218, 1222 (11th Cir. 2004) (noting the elements of a section 517.301 claim are similar to those under Federal Rule 10b-5 with some exceptions). Under rule 10b-5, a material fact is a fact that would be important to a reasonable investor in deciding whether to invest—meaning that there is a

---

[17] At oral argument, counsel for Geveran conceded that reliance is an element of a claim under section 517.211. We note that one federal court has found that reliance is not an element under that section. Waters v. Int'l Precious Metals Corp., 172 F.R.D. 479, 492–96 (S.D. Fla. 1996). Geveran has also not argued here or below that reliance should be presumed given that its claim is based on an omission. Cf. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 152 (1972) (concluding that court erred in requiring reliance in case involving omission of material information under rule 10b-5).

[18] As to the first element, misrepresentation or omission, LSG's failure to disclose the SEC letters to Halvorsen was a clear omission. We note, however, that note five of LSG's 2010 form 10-K disclosed LSG's decision to treat obsolete inventory as a cost of goods sold. While we doubt that this disclosure, standing on its own, would be sufficient—Geveran has no obligation to consult an accountant to review the entire form 10-K—it is worth noting that the information was disclosed, albeit not in a form easily accessible to investors. In addition, Namburi testified that he actually disclosed the SEC comment letters to Halvorsen. While that testimony is of questionable reliability given its lack of specificity, assessing the credibility of a witness is generally a matter for the jury.

[19] 17 C.F.R. § 240.10b-5 (2016) (implementing 15 U.S.C. § 78j (2016)).

"substantial likelihood" the reasonable investor would have viewed the misrepresentation as altering the "total mix" of available information. Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988) (adopting materiality standard from TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)); cf. Restatement (Second) of Torts § 538 ("The matter is material if [] a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question . . . ."); SEC Staff Accounting Bulletin: No. 99, 64 Fed. Reg. at 45151 (noting that the accounting standard for materiality is "in substance identical to the formulation used by the courts in interpreting the federal securities laws").

Geveran recognizes the inherent factual issues in determining whether the 2008 and 2009 restatements of gross margins were themselves material. Geveran focuses instead on the concealment of the SEC comment letters and LSG's failure to maintain GAAP compliant financial records as the material omissions and misrepresentations to support the order granting summary judgment. The subscription agreement between the parties included detailed assurances that LSG's 2010 form 10-K complied with GAAP and all relevant SEC rules. Halvorsen's deposition testimony repeatedly emphasized the importance of GAAP compliance to Geveran not only because GAAP compliance allows for an objective evaluation of the financial strength of a particular investment, but also because GAAP compliance was necessary to obtain SEC approval of LSG's re-IPO.

Geveran's FSIPA claim, however, is not a claim on the subscription agreement, but rather a statutory claim, meaning that materiality must be based on the effect of the omission and misrepresentation on a reasonable investor looking at the total mix of information. See Levinson, 485 U.S. at 231–32. McGladrey looked at LSG's accounting

error, prepared its own analysis, and determined that the misrepresentation of the 2008 and 2009 gross profits was not material and that LSG's 2008 and 2009 financial statements remained materially compliant. The defendants' expert witnesses concurred in this assessment. They focused on the significant changes to LSG's business model from 2008 and 2009 to 2010. In addition, GAAP are not a single, unified standard but rather a set of possible accounting treatments. See Thor Power Tool Co. v. C.I.R., 439 U.S. 522, 544 (1979) (noting GAAP compliance is not a single standard). We believe a reasonable juror could infer from these facts that the accounting error regarding the 2008 and 2009 gross margins would not be a material misrepresentation to a reasonable investor.[20]

Geveran points out that LSG quickly acquiesced to the SEC's recommendation that the 2008 and 2009 financial statements needed to be restated, a step that the SEC only requires for past financial statements if the restatement is material. Yet many federal courts have held that a misstatement under the accounting standard for materiality is not per se material as a legal matter. See, e.g., In re Atlas Mining Co., Sec. Litig., 670 F. Supp. 2d 1128, 1133 (D. Idaho 2009) (rejecting theory, under rule 10b-5, that restatement of financials is an admission of falsity and materiality and collecting cases). The fact that LSG agreed to restate its previous financial statements is strong evidence of a material omission, but it is not dispositive and must be weighed against expert testimony and

---

[20] Halvorsen's own analysis of LSG looked to LSG's recent contract with Home Depot and shifting base of manufacturing from the United States to Mexico, suggesting the 2008 and 2009 gross margins were not material to the investment decision.

analysis by LSG's accountant along with the fact that LSG's business model was changing significantly, making the 2008 and 2009 financials less relevant.[21]

Finally, we note as well that materiality is most often a jury question as it involves a full assessment of the various potentially relevant facts and surrounding circumstances. See Ward v. Atl. Sec. Bank, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001). Although we do not doubt that Geveran has a strong argument that LSG's misstatements were material, ultimately assessing alternative versions of events based on a review of various documents and competing testimony is the role of the jury. We do not believe, given the circumstances of this company, that the defendants' omission of the SEC comment letters and the misrepresentation that the 2008 and 2009 financial statements were GAAP compliant were material as a matter of law.

In addition to a genuine issue of fact as to materiality, we also find a genuine issue of material fact exists as to whether Geveran relied on the omitted SEC letters and the misrepresented accounting figures. Consistent with Geveran's concession and the Florida Supreme Court's opinion in Rousseff, Geveran must show that it actually relied on the omission or misrepresentation. See 537 So. 2d at 981. But see Waters, 172 F.R.D. at 492–96 (finding that statement as to justifiable reliance in Rousseff was dicta and holding reliance is not an element of a section 517.301 claim seeking rescission).[22]

---

[21] We are mindful that Geveran was not only investing in a product line but also in the entire company. Nonetheless, the shift in LSG's core operations creates a genuine issue of fact as to the materiality of LSG's past performance.

[22] We note as well that the Florida Supreme Court's decision in Rousseff refers to justifiable reliance. 537 So. 2d at 981. Yet many cases state that the plaintiff in a FSIPA claim need only show that the plaintiff relied on the omission or misrepresentation not that such reliance was justified. See, e.g., Desrosiers, 689 So. 2d at 1107 (holding reliance is an element of a cause of action under 517.301). In the context of common law claims, the

Even though an average investor would generally rely on assurances given in an investment contract, Halvorsen is not an average investor. Halvorsen was given complete access to confidential information at LSG as well as J.P. Morgan's due diligence materials. By his own admission, he looked carefully at LSG and performed an extensive independent review. Halvorsen was adamant during his deposition that he was not an accountant and could not have identified the flaws in LSG's accounting merely by reading

Florida Supreme Court has held that the level of reliance required is dictated by the level of culpability required to establish liability—liability for merely negligent misrepresentations extends only to statements justifiably relied on while liability for fraudulent statements extends to any statement actually relied on. See Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010) (reiterating justifiable reliance is an element of a negligent misrepresentation claim but not a claim for fraudulent misrepresentation); see also Restatement (Second) of Torts § 552 cmt. a (1977) ("The liability stated in this Section is likewise more restricted than that for fraudulent misrepresentation stated in § 531. When there is no intent to deceive but only good faith coupled with negligence, the fault of the maker of the misrepresentation is sufficiently less to justify a narrower responsibility for its consequences.").

In the context of a statutory claim under section 517.301 based on a direct sale, we believe it is appropriate to presume that the reliance was justified. The exhaustive statutory scheme created by the FSIPA evidences a legislative intent to extend liability beyond the common law cause of action for negligent misrepresentation and encourage investors to rely on representations from a seller of securities.

As to the state of mind required to establish liability, we follow the majority of decisions surveyed in finding that liability exists for mere negligence. See, e.g., Gochnauer v. A.G. Edward & Sons, Inc., 810 F.2d 1042, 1046 (11th Cir. 1987). Claims under the FSIPA seeking rescission based on a direct sale are more similar to section 12 claims under the federal Securities Act of 1933. Rousseff, 537 So. 2d at 981. In a section 12 claim, the burden is on the defendant to show that "he did not know, and in the exercise of reasonable care could not have known" of the falsity of the information—although recent amendments have added a requirement that the plaintiff show the omission caused its damages. 15 U.S.C. § 77(*l*). We believe it would be inconsistent to require a plaintiff proceeding under Florida law to prove fraudulent intent when the same plaintiff proceeding under federal law would not be so required. See § 517.24, Fla. Stat. (2012) (providing that "[t]he same civil remedies provided by laws of the United States for the purchasers or sellers of securities, under any such laws, in interstate commerce extend also to purchasers or sellers of securities under [the FSIPA]").

note five of the 2010 form 10-K. Yet a jury could determine that Halvorsen conducted an independent assessment of LSG and made his own decision to invest by relying on information other than the 2008 and 2009 gross margins.

Furthermore, the circumstances surrounding the restatement suggest that Halvorsen might not have relied on the omissions and misrepresentations. Halvorsen did not react unfavorably when he learned of the restatement, and he continued to take an optimistic view of LSG. Only when LSG's re-IPO continued to lag and the company began to offer more favorable credit terms to lure new investors did Halvorsen object and bring suit. Even though the contract provisions and Halvorsen's testimony are powerful evidence that compliance with SEC regulations and GAAP principles was important to the investment, there is a genuine issue of material fact as to whether Halvorsen relied on those assurances in determining whether to invest or whether he made the decision based on other information. His own assessment of LSG focused on the market for green-energy technology generally and specific challenges facing LSG in shifting its manufacturing base.

Therefore, we reverse the trial court's order granting summary judgment on Geveran's claims under the FSIPA. We find there are genuine issues of material fact as to whether the omission of the SEC letters and the misrepresentation of LSG's 2008 and 2009 financial statements were material to a reasonable investor. We also find there is a genuine issue of material fact as to Halvorsen's reliance on those omissions and misrepresentations.

17

Finally, we turn to Namburi, Schreck, and Pegasus's claims that they are not liable under FSIPA.[23] Section 517.211 creates liability for two classes of persons: 1) sellers, and 2) "every director, officer, partner, or agent of . . . [the] seller." § 517.211(2), Fla. Stat. Liability for the second category is further limited to those persons who "personally participated or aided in making the sale or purchase." Id. Although "seller" is not a defined term under the statue, the federal courts that have considered the issue of who is a "seller" under section 517.211 have relied on the United States Supreme Court's decision in Pinter v. Dahl, 486 U.S. 622 (1988), which held that liability under section 12 of the Securities Act extends to anyone who solicits an investment "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." 486 U.S. at 647; see also Hilliard v. Black, 125 F. Supp. 2d 1071, 1083 (N.D. Fla. 2000) (noting reliance on Pinter); Beltram v. Shackleford, Farrior, Stallings, & Evans, 725 F. Supp. 499, 500 (M.D. Fla. 1989) (same).

As to Pegasus, Geveran focuses on Pegasus's role in soliciting Geveran's investment as a majority, controlling shareholder of LSG, which could bring Pegasus under the category of "seller" for the purposes of section 517.211. See Pinter, 486 U.S. at 647. LSG's S-1/A and 2010 form 10-K disclosed Pegasus as a controlling shareholder in LSG. There is no dispute that Pegasus had a significant financial interest in LSG. Thus,

---

[23] Pegasus only appeals from the denial of its motion for summary judgment. Accordingly, we assess the record under the summary-judgment standard of review. J.P. Morgan appeals from the denial of its motion to dismiss the claims against Namburi and Schreck. We review the order denying the motion to dismiss de novo to assess whether the allegations contained within the four corners of the complaint, taken in the light most favorable to Geveran, state a claim for which relief could be granted. See Huet v. Mike Shad Ford, Inc., 915 So. 2d 723, 725 (Fla. 5th DCA 2005).

there is, at a minimum, a genuine issue as to whether Pegasus would have benefited from Geveran's investment.

There is also a genuine issue as to whether Pegasus and its employees solicited Geveran's investment and participated in the alleged omission and misrepresentations. The record shows involvement by employees of Pegasus in making the sale. Weinberg, in addition to his position with LSG as CEO, was a senior partner at Pegasus and was on the board of LSG as a representative of Pegasus and its controlling interest in LSG. Weinberg attended the meeting in Florida and was a primary salesman, according to Halvorsen. In addition, Jared Berheim and Steven Wacaster, two other Pegasus representatives, participated in the meeting. Weinberg, Bernheim, and Wacaster were also provided copies of the SEC comment letters soon after they were received.

Pegasus argues, nonetheless, that it cannot be liable under section 517.211 because of the buyer/seller privity requirement it claims the Florida Supreme Court recognized in Rousseff. 537 So. 2d at 981. This statement from Rousseff is misleading, however. Section 517.211, by its plain language, extends liability to "every director, officer, partner, or agent of or for the purchaser or seller." § 517.211(2), Fla. Stat. Such parties would not necessarily be in privity of contract with the buyer or seller in a strict sense. Rousseff established that parties liable under section 517.211 have to be directly involved in a sale of securities. The Court was distinguishing liability under section 517.211 from liability under federal rule 10b-5, which extends to fraud more generally, whether conducted during the sale of securities or not.[24] The Court used "privity" as a

---

[24] Rousseff, 537 So. 2d at 981 ("Rule 10b-5 is wide-ranging, covering a broad spectrum of fraud. It applies to any person who is deceitful in connection with the purchase or sale of securities. It requires no privity between buyer and seller. Remedies

short-hand for a direct sale of securities distinct from general corporate malfeasance. See In re Sahlen & Assocs., Inc. Sec. Litig., 773 F. Supp. 342, 372 (S.D. Fla. 1991) (disapproving of a reading of Rousseff in the "strict sense" based on the plain language of the statute); see also Michael A. Hanzman, Civil Remedies Under the Fla. Secs. & Investor Protection Act, 64 Fla. Bar J. 36 (Oct. 1990) (approving of Rousseff in general but noting that the privity requirement, in a strict contractual sense, cannot be correct). In this context, section 517.211 is transaction-specific, while other provisions of Florida statutory and common law reach other types of wrong-doing by corporate officers.

To summarize, Pegasus's pecuniary interest in Geveran's investment and the evidence of its participation in soliciting the investment creates a genuine issue of fact as to Pegasus's liability as a seller under the FSIPA, making the denial of Pegasus's motion for summary judgment appropriate. Yet, as with LSG and J.P. Morgan, genuine issues of material fact preclude summary judgment in Geveran's favor on its FSIPA claim.

As to Namburi and Schreck, Geveran's second amended complaint alleged that Namburi and Schreck were liable under section 517.301 for soliciting Geveran's investment and as agents of the seller, LSG. While Geveran's complaint alleges that Namburi and Schreck "solicited the sale of LSG stock," it does not allege that Namburi and Schreck had a personal interest in the transaction—only that J.P. Morgan would receive an agency fee. There is also no allegation that Namburi and Schreck acted to

---

are not restricted. . . . The Florida statutes, on the other hand, are far more restrictive. . . . Section 517.211 says that if a seller (or buyer) is untruthful in a sale, the buyer (or seller) can rescind the transaction and get his money back. This provision applies to a far more narrow group of activities than does rule 10b-5. Buyer/seller privity is required.").

serve the interests of LSG, given that they were actually employees of J.P. Morgan. Thus, Geveran has not alleged facts sufficient to state a claim on the basis that Schreck and Namburi are liable as "sellers."

As noted above, section 517.211(2), Florida Statutes (2012), also extends liability to "every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase." It is undisputed that Namburi and Schreck were not directors, officers, or partners of LSG, so if they are liable under this category, it must be as agents of LSG. The Fourth District Court of Appeal has held that under section 517.211, the term "agent" is given its common meaning—"representation of a principal." Rubin v. Gabay, 979 So. 2d 988, 990 (Fla. 4th DCA 2008). Agency can either be actual or apparent. Id. The elements of actual agency are: 1) acknowledgment by the principal of the agent; 2) the agent's acceptance; and 3) control of the agent by the principal. Id.

While Namburi signed the agency agreement with LSG, he did so as an employee of J.P. Morgan and not in his personal capacity. Schreck did not sign the agreement and had a narrower role in the transaction. The second amended complaint specifically alleges that J.P. Morgan had a contractual relationship with LSG to act as its agent in soliciting the investment and attached the agreement to the complaint. The complaint does not allege or demonstrate that either Namburi or Schreck accepted an agency agreement with LSG or that LSG exercised control over them. Therefore, Geveran failed to state a cause of action against Namburi and Schreck based on an actual agency theory.

21

Likewise, whatever apparent agency is alleged to exist in the transaction was apparent agency between J.P. Morgan and LSG, rather than Namburi, Schreck, and LSG. The elements of apparent agency are: 1) a representation by the principal; 2) reliance by a third party; and 3) a change in position by the third party based on the representation of an agency relationship. Id. The second amended complaint does not allege any facts relating to these elements but merely asserts that Namburi and Schreck were agents or "subagents" of LSG by virtue of their employment with J.P. Morgan. This is insufficient to state a cause of action under an apparent agency theory.

Geveran argues that Namburi and Schreck are nonetheless liable because they "personally participated or aided in making the sale." § 517.211(2), Fla. Stat. Yet personal participation is a limitation on the list of people enumerated in the statute who may be liable—officers, directors, partners, and agents who personally participated. Geveran essentially reads additional language into the statute that would extend liability to anyone who personally participated or aided in the sale even if the party did not have a pecuniary interest in the investment and did not qualify as an officer, director, partner or agent under the statute. This reading conflicts with the statutory text and is not supported by any other source. Therefore, because Geveran failed to allege facts that would establish that Namburi and Schreck were agents of LSG, the trial court erred in denying J.P. Morgan's motion to dismiss Geveran's claim against them.

In sum, we find that the complaint did not state a claim against Namburi and Schreck. Therefore, the trial court's order denying J.P. Morgan's motion to dismiss Geveran's claims against Namburi and Schreck is reversed and remanded with directions for the court to dismiss the claims against them. The summary final judgment entered

22

against the remaining defendants, including Pegasus, is reversed because there are genuine issues of material fact as to the materiality of LSG's misrepresentations and omissions as well as to Geveran's reliance. The case is remanded for further proceedings.

REVERSED; REMANDED with instructions.

SAWAYA and WALLIS, JJ., concur.